The PYMATUNING WATER SHED
CITIZENS FOR A HYGIENIC
ENVIRONMENT, Plaintiff,

v.

Bert EATON, Frank Arey, Robert Hutton,
Ralph Robison, John Schutzbach and
Ronald Staab as members of the Board
of the North and South Shenango Joint
Municipal Authority and the North and
South Shenango Joint Municipal Au-
thority, Defendants.

Civ. A. No. 79–70 B Erie.

United States District Court,
W. D. Pennsylvania.

Aug. 14, 1980.

John Adams, Jr., Pittsburgh, Pa., for plaintiff.

Paul D. Shafer, Jr., Meadville, Pa., for defendants.

## MEMORANDUM OPINION

KNOX, District Judge.

Plaintiff brought suit against the defendants, basing jurisdiction on the Federal Water Pollution Control Act (FWPCA) (Clean Water Act), 33 U.S.C. § 1251 *et seq.*, for allegedly discharging sewage sludge and other sewage material into the Shenango River and its tributaries. Plaintiff sought preliminary and permanent injunctive relief against the defendants named herein, several contractors, North Shenango Township, South Shenango Township, and the members of the Board of the North and South Shenango Joint Municipal Authority in their individual capacities for violations of the Clean Water Act. A hearing on plaintiff's motion for a preliminary injunction commenced on June 20, 1979 and, at the conclusion of the hearing on June 22, 1979, the Court denied plaintiff's motion "for the present but with liberty to the plaintiff at any time evidence of [statutory violations] is developed to bring the matter again to the attention of the Court." (Notes, 311). The Court granted motions to dismiss or for summary judgment in favor of the contractors, the Townships, and the members of the Board of the North and South Shenango Joint Municipal Authority in their individual capacities for lack of personal and subject matter jurisdiction. On May 21, 1980, the case was tried to the court nonjury. We have carefully reviewed the evidence introduced during the three days of trial and the arguments of counsel and, therefore, the case is now ripe for adjudication. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, we make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The plaintiff, The Pymatuning Water Shed Citizens for a Hygienic Environment, is a Pennsylvania non-profit corporation. Membership in the plaintiff corporation is limited to persons living in or having some ecological or recreational interest in the Pymatuning Water Shed area. The officers of the plaintiff are: George Stratford, President; Walter Krothe, Vice-President; and Linda L. Brown, Secretary-Treasurer. The defendant, North and South Shenango Joint Municipal Authority (Authority), was formed by resolutions of the North and South Shenango Townships in the Fall of 1974, for the purpose of planning and building a sewage disposal system for the area. The additional defendants are the members of the Board of the Authority.

On October 30, 1974, the Authority retained Northwest Engineering, Inc. of Tidioute, Pennsylvania to prepare plans and specifications, and apply for the necessary grants and loans for the sewage system. The system is designed to service portions of North and South Shenango Townships, Crawford County, Pennsylvania, extending from Espyville on the north to the outskirts of Jamestown Borough on the south and from the Penn Central Railroad tracks

westerly to the Pymatuning Reservoir shoreline. The drainage basin for most of this area is the Pymatuning Reservoir and a small portion of South Shenango Township drains into the Crooked Creek drainage system. These basins are, in turn, part of the larger Shenango River drainage basin.

On February 4, 1975 the Authority submitted an application to the Bureau of Water Quality Management, Department of Environmental Resources, Commonwealth of Pennsylvania, for a Water Quality Management Permit. Amendments to the application were filed on June 20, 1975, September 20, 1975, and September 24, 1975, and the DER issued the permit on September 18, 1976.

Construction began in 1977 and on April 20, 1979, Certificates of Substantial Completion were issued by Northwest Engineering, Inc. to the contractors. By November 1, 1979, ninety per cent of the customers were using the system.

Surface water from pavements, area and roof drains, and flooded manhole covers frequently enters the system in violation of Conditions 5, 8, and 16 of the DER permit and in violation of Condition 16 of the Standard Conditions Relating to Erosion Control of the DER permit.[1] On September 14, 1979, December 24–25, 1979, January 11, 1980, and February 22, 1980, the flow of sewage through the system significantly exceeded the estimated flow per day because of excessive inflow. As a result of the inflow which occurs generally during periods of heavy rainfall, there have been numerous discharges of raw or untreated sewage into the Shenango River and its tributaries. On December 25, 1979 and February 22, 1980, the flow records indicate that the holding capacity of the tanks at the treating facility had been exceeded. Overflows and surcharging have occurred at pump stations I–2, I–3, I–6, C–2, C–4, C–5, C–8, C–12, C–13, and C–17 at various times in July, August and September of 1979. Overflows and flooding are likely to occur in the future unless substantial corrective measures are taken.

During periods of heavy rainfall, excessive infiltration of the system has occurred in violation of Conditions 3, 4, 8, and 16 of the DER permit and Condition 6 of the Standard Conditions Relating to Erosion Control of the DER permit.[2] Infiltration is

1. The Standard Conditions provide, as follows:
   FIVE: No storm water from pavements, area ways, roofs, foundation drains or other sources shall be admitted to the sanitary sewers herein approved.
   EIGHT: The herein approved and previously constructed sewers shall be maintained in good condition, by repair when necessary and kept free from deposits by flushing or other proper means of cleaning.
   SIXTEEN: The various structures and apparatus of the sewage treatment works herein approved shall be maintained in proper condition so that the facilities will individually and collectively perform the functions for which they were designed.
   Condition Sixteen of the Standard Conditions Relating to Erosion Control provides, as follows:
   16. No storm water, sewage or industrial wastes not specifically approved herein, shall be admitted to the measures and facilities for which this permit is issued, unless with the approval of the Department.

2. The Standard Conditions provide, as follows:
   THREE: Sewers herein approved shall have tight, well-fitting joints, shall be laid with straight alignment and grade and shall have smooth interior surfaces. The sewers shall have adequate foundation support as soil conditions requires. Special care shall be taken in construction of sewers under deep or shallow cover and under other conditions which impose extra hazards to sewer stability. Trenches shall be back-filled such that the sewers will have proper structural stability, with minimum setting and adequate protection against breakage. Concrete used in connection with these sewers shall be protected until cured from injury by water, freezing, drying or other harmful conditions.
   FOUR: Manholes shall be placed and constructed as shown upon the herein approved plans except, that if not already so provided, they shall be placed on all sewers at junctions, at each change in grade or alignment, at summit ends, and upon straight lines at intervals not exceeding four hundred feet, or whatever necessary to permit satisfactory entrance to and maintenance of the sewers; manhole inverts shall be so formed as to facilitate the flow of the sewage and to prevent the stranding of sewage solids, and the whole manhole structure shall have proper structural strength and be so constructed as

water which leaks from the ground into the sewer through such sources as broken pipes, defective joints, and leaky manhole barrels. A report of the inspections of selected manholes conducted by the engineering firm of Betz, Converse, Murdoch, Inc. of Pittsburgh, Pennsylvania, revealed that the sagging of the pipe lines and the separation of the joints resulted from poor construction. The firm reported that the pipe bedding and backfill was improperly placed, and settlement occurred in the trenches, thereby causing the lines to sag and the joints to separate. The firm further concluded that most of the leaky joints were associated with clay pipe. As a result of excessive infiltration, raw or untreated sewage has been discharged into the Shenango River and its tributaries during periods of heavy rainfall.

In an effort to seal the leaky joints and reduce infiltration, one or more of the contractors used chemical grouting, a correcting procedure which is used to seal leaky joints when the pipe is otherwise structurally sound. In its report, Betz, Converse described grouting, as follows:

"The grout used on this job was a polyacrylamide gel commonly known by its trade name 'AM–9.' The system has three components, the monomer, the catalyst and the initiator. The monomer and catalyst are powders which are dissolved in water to form a 10% monomer solution. The initiator is dissolved in water separately. When the monomer-catalyst solution is mixed with the initiator solution they quickly react to form a semi-solid rubbery material called a gel. The time for gel formation can be controlled by adjusting the concentrations of the chemicals. It is also influenced by temperature.

To seal leaky joints the liquid chemicals are mixed, and using a special packer, are quickly forced from inside the pipe out through the particular joint that was found to be leaking. At that point the mixture is a thin liquid which flows like water and penetrates the soil around the leaky joint. Within a short period of time, typically 20 seconds, the mixture saturates the soil and fills all voids near the pipe and then gels in place. The resulting rubbery material effectively blocks the infiltration of water into the pipe. After sealing, the joint is tested with air pressure to show that the leak has been sealed.

The maximum effective life of an AM–9 sealing job is not known. The material has been in use for approximately 20 years and installations of that age are still effective. It is relatively inert material and is resistant to attack by bacteria, other microorganisms and the chemicals normally found in the soil.

The most serious adverse condition is dehydration. The gel is composed of about 90% water and 10% polymer and will maintain its rubbery consistency only as long as this water is not lost. When surrounded by and saturated with water the gel remains intact and continues to provide a good seal. This would be the case in a location where the water table is always above the pipe. On the other hand, if the water table ever drops below the pipe and the soil is no longer saturated with moisture, the grout may begin to dry out and could shrink and crack. If the water table would rise again the grout would partially rehydrate and swell but cracks previously formed would usually not heal completely. These cracks could then provide channels for water to find its way into the joint again. Additional cycles of dehydration and rehydration would tend to form more and larger cracks and could ultimately, over the years, lead to the complete failure of the

to prevent undue infiltration, entrance of street wash or grit, and to provide convenient and safe means of access and maintenance. EIGHT: See n. 1, *supra*. SIXTEEN: See n. 1, *supra*. Condition 6 of the Standard Conditions Relating to Erosion Control provides, as follows:

6. Approval of plans refers to functional design and not constructional stability, which is assumed to be sound and in accordance with good structural design. Failure of the measures and facilities herein approved because of faulty structural design or poor construction will render the permit void.

seal. Drying out of the gel may be delayed by the addition of moisturizing agents such as calcium chloride."

Betz, Converse, Murdoch, Inc., Sanitary Sewer System Review, 31–32. The specifications for this system did not provide for grouting.

After the Authority discovered that some of the contractors were attempting to seal the leaky joints with grout, the procedure was barred by resolution on March 6, 1978. On April 18, 1978, the Authority authorized chemical grouting subject to certain conditions. Although the Betz, Murdoch report concludes that the use of grouting was appropriate, neither the evidence presented at the hearing on the motion for preliminary injunction and the trial nor the discussion contained in the report support this conclusion. Some of the pipe has been laid above the water table and hence the grout utilized there may dehydrate, crack, and ultimately fail to seal the leaky joints. Most of the leaky joints have been identified in the clay pipes which have been poorly constructed. The use of grouting is ineffective in sealing structurally defective pipes. While the Betz, Murdoch report cautions against the use of indiscriminate grouting, certain contractors employed grouting in 8% of certain pipe lines before the Authority ever authorized the procedure. The Betz, Murdoch report failed to examine an indeterminate number of grouted joints since the video survey could only identify grouted joints where there was visible grout residue left on the inside of a pipe joint. Most importantly, infiltration remains high during periods of rainy weather despite the use of grouting. It is apparent that grouting has failed to remedy the excessive infiltration and resulting sewage discharges into the Shenango River and its tributaries.

Defendants have admitted that the system has suffered some mechanical malfunctions and problems arising from illegal connections and from the location of sludge drying beds have arisen. Whatever violations of the permit, if any, may have occurred, as a result of these problems, such violations have been remedied by the defendants.

## DISCUSSION

Plaintiff instituted this suit against the defendants, basing jurisdiction upon section 505 of the Clean Water Act, 33 U.S.C. § 1365, which provides:

§ 1365. Citizen Suits

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment [of] the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

(b) No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such

action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

(c)(1) Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.

(2) In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

(d) The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

(f) For purposes of this section, the term "effluent standard of limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; or (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title).

(g) For the purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.

(h) A Governor of a State may commence a civil action under subsection (a) of this section, without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State.

■ Section 505 of the Clean Water Act authorizes any citizen to commence a civil action on his own behalf against any person, including a municipal governmental agency, who is alleged to be in violation of effluent standards or limitations under the Clean Water Act, or in violation of a compliance order issued by the Administrator or by the state with respect to a standard or limitation. The United States District Court is expressly given jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce effluent standards. Actions under the citizen action provision must be brought in the judicial district in which the source is located which is alleged to have violated an effluent standard, limitation, or order. Before a citizen may bring an action as authorized, he must give 60 days' notice to the Administrator and to the state in which the alleged violation occurred. He must also give notice to any violator of the alleged standard or order. The 60-day notice requirement is absolute on its face and is a

jurisdictional requirement. We have previously held that plaintiff has complied with the notice provision.

■ The term "citizen" has been defined for the purposes of the citizen suit as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). *Montgomery Coalition v. Fri*, 366 F.Supp. 261 (D.C.1973). In other words, the plaintiff must demonstrate that it is in the category of persons the statute protects and that it has some special interest in the particular waterway that it is seeking to protect. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In this suit, plaintiff has demonstrated that it and its members have a special interest in the Pymatuning Reservoir and therefore is an appropriate plaintiff to seek adequate enforcement of effluent standards from sources in North and South Shenango Townships.

Plaintiff has alleged violations of several conditions contained in Water Quality Management Permit No. 2075402 issued by the Department of Environmental Resources of the Commonwealth of Pennsylvania. § 1365(f)(6) provides that all dischargers may be sued to enforce permit conditions, whether these conditions arise from standards and limitations promulgated by the Administrator or from stricter standards established by a state under section 402 of the Clean Water Act. 33 U.S.C. § 1342. *Environmental Protection Agency v. California*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Under section 402(b), a State may issue a National Pollutant Discharge Elimination System (NPDES) permit "for discharge[rs] into navigable waters within its jurisdiction," upon EPA approval of the State's proposal to administer its own program. Pursuant to the terms of the Memorandum of Agreement between the Pennsylvania Department of Environmental Resources and the EPA, the Commonwealth is authorized to administer the NPDES permit program. *See* 40 C.F.R. § 123.1 *et seq.*

■ We have found that the defendants have violated several of the conditions of the permit issued pursuant to an authorized NPDES permit program. The excessive inflow and infiltration will continue to result in discharges of raw or untreated sewage into the Shenango River and its tributaries. The evidence clearly shows that grouting failed to correct the infiltration problem. Whether defendants complied with the terms of their application for permit or the project specifications as they assert does not excuse them from fulfilling the conditions of the permit. It is well established that defendants must employ the "best practicable control technology currently available" in meeting the requirements of a NPDES permit. 33 U.S.C. § 1311(b)(1); *Marathon Oil Co. v. Environmental Protection Agency*, 564 F.2d 1253 (9th Cir. 1977). Further, the permit provides that "If there is a conflict between the application or its supporting documents and amendments and the standard or special conditions, the standard or special conditions shall apply."

■ Inasmuch as we have found violations of the NPDES permit it is unnecessary to determine whether plaintiffs have proved violations of effluent standards or limitations under section 301, 33 U.S.C. § 1311 or any other section of the Clean Water Act. We, therefore, turn to the question of appropriate relief in light of the NPDES violations. As we have previously stated in denying plaintiff's motion for preliminary injunction, the causes of the system's problems stem from poor construction and the parties are thus encouraged to seek relief in the state courts since we have no jurisdiction to consider such claims. Whatever relief this court grants may result in greater expense to the users of the system since the funding for its construction is provided, in part, through connection charges and other user assessments.

■ Like any court of equity, the district court has very broad power to fashion a remedy appropriate to deal with the factual situation before the court. *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971). Where an injunction will require federal interference with local government administration,

equitable relief must be specifically tailored to the specific violations shown. *Schweiker v. Gordon,* 442 F.Supp. 1134 (E.D.Pa.1977); *Commonwealth v. Porter,* 480 F.Supp. 686 (W.D.Pa.1979).

 In order to effectuate the purpose of the Clean Water Act, namely to eliminate the discharge of pollutants into the nation's waters, 33 U.S.C. § 1251(a), defendants are directed to utilize the "best control technology currently available" to attain compliance with the conditions of the NPDES permit. 33 U.S.C. § 1311(b)(1). Defendants must be given a reasonable opportunity and a reasonable time to accomplish an abatement of the excessive inflow and infiltration and resulting discharges of raw or untreated sewage into the Shenango River and its tributaries. We cannot now precisely measure this time. The potential for harm in the Authority's discharges does not impart a degree of urgency that would otherwise be found where, in addition to ecological pollution, health risks were proved. *Reserve Mining Co. v. Environmental Protection Agency,* 514 F.2d 492, 537–538 (8th Cir. 1975). Accordingly, we direct the defendants to submit to the Court, within 90 days from the date of this Order, a written proposal containing the plans necessary to bring the system into compliance with the conditions of the permit. The Court will retain jurisdiction of this action pending a review of defendants' proposal.

Pursuant to 33 U.S.C. § 1365(d), plaintiff may submit to the Court, within 30 days of this Order, a petition for litigation costs, including reasonable attorney and expert fees.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction to enforce compliance with effluent standards and limitations, as alleged herein, pursuant to section 505 of the Clean Water Act, 33 U.S.C. § 1365.

2. Defendants have violated several conditions of DER Water Quality Management Permit No. 2075402, an authorized NPDES permit.

3. The Court has the power to order injunctive relief to enforce compliance with the provisions of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

An appropriate order will be entered.