**PENNBANK and First Seneca Bank, Plaintiffs,**

v.

**The UNITED STATES of America, and its agencies, the Environmental Protection Agency and the Farmers Home Administration of the United States Department of Agriculture, Defendants.**

**Civ. A. No. 84–24 ERIE.**

United States District Court, W.D. Pennsylvania.

Jan. 9, 1985.

Lawrence A. Demase, Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for plaintiffs.

Craig R. McKay, Asst. U.S. Atty., Pittsburgh, Pa., Donald Lewis, Asst. U.S. Atty., Erie, Pa., for United States.

Ray Spears, U.S.E.P.A., Washington, D.C., David Oblich, Farmers Home Admin., Harrisburg, Pa., for defendants.

## OPINION

WEBER, District Judge.

This dispute flows from an unpleasant situation facing certain residents of Crawford County, Pennsylvania. The dwellings of North and South Shenango Townships are tapped into a sewage system that does not work. The system's defects allegedly were caused by faulty construction. That issue, however, is not before us.[1] The question here is whether two agencies of the federal government are liable for construction expenses advanced by plaintiff banks for failing to discover the defects before the system was completed.

The North and South Shenango Joint Municipal Authority ("Authority") was formed in 1974 to provide sanitary sewer service for area residents. The Authority hired an engineering firm that same year to plan construction. To obtain financing, the Authority submitted these plans to the Environmental Protection Agency ("EPA"), the Farmers Home Administration ("FmHA") (also referred to collectively as "the Agencies") and the Pennsylvania Department of Environmental Resources ("DER"). These bodies reviewed the plans and in September 1976 the EPA awarded a grant of $8,600,000 to the Authority. The DER also awarded a grant totalling $165,000. The FmHA approved a long term loan for the project for $3,200,000 in January 1977 contingent upon satisfactory completion of the project.

Because FmHA regulations prevented closing of the loan before construction was complete, the Authority arranged for interim financing. In January 1977, plaintiff Pennbank agreed to extend up to $6,000,000 credit to the Authority, to be repaid in three years. Plaintiff First Seneca Bank obtained a participating interest in the interim loans through a separate agreement with Pennbank (referred to collectively as "the Banks").

Construction of the sewage system began in mid-1977. Estimated costs of the project totalled more than $13,000,000. In April 1979 construction of approximately 77 miles of sewer, 22 pumping stations, and a 1.2 million gallon per day sewage treatment plant was completed.

The Banks ultimately extended by one year the time for loan repayment, to January 1981. Certain residents of North and South Shenango sued the Authority in this court in 1979 for violating the Clean Water Act, 33 U.S.C. § 1251 et seq. (1976) a suit specifically based on the faulty condition of the sewage system. *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 506 F.Supp. 902 (W.D.Pa. 1980). This case eventually reached the Court of Appeals for the Third Circuit. *See* 644 F.2d 995 (3d Cir.1981). The suit and its appeal stretched into early 1981; the Authority could not close the FmHA loan and repay the Banks with legal action pending against it. On April 3, 1981 the Authority received notice from the FmHA that it would not close the loan under the conditions stirred up by the litigation: ac-

---

1. That question is presently pending in one or more suits filed by the Authority in Crawford County, Pa. Common Pleas Court in 1981 in which over thirty individuals or business entities are named defendants.

tion in the court of appeals, an investigation by the FmHA's inspector general, and a DER order restricting use of the sewage system.[2]

On April 21, 1981 a bank officer attended a meeting with members of the Authority, its solicitors, and an engineer independently retained by the Authority to inspect the sewage system. The Banks claim this as the occasion when they first learned of serious defects in the system. In subsequent meetings between the Authority, the Banks, and the Agencies, the FmHA refused to close its loan and the EPA refused to make its final grant payment. The Banks seized the Authority's operating funds then on deposit, but those were not nearly enough to cover the outstanding interim loans for which the expectation of long term federal financing had dissolved. On February 7, 1983, the Banks filed administrative claims with the Agencies to satisfy the requirements of the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 2671–80 (1976). These claims were denied on July 27, 1983 and the Banks filed this suit on January 20, 1984. They contend that the Agencies were negligent in failing to discover any defects in construction of the sewage system during the course of Agency development inspections. The Banks seek $3,600,000 in damages, the amount of outstanding loans to the Authority which the Agencies initially agreed to cover through federal funding.

Following their answer, the Agencies filed a motion to dismiss, or, in the alternative, for summary judgment on April 30, 1984. They argue that the Banks' claim is time barred; that it is barred by the misrepresentation exception to the FTCA; that the claim is one for interference with contract rights not subject to suit under the FTCA; that the Banks have failed to state a cause of action under Pennsylvania law upon which relief can be granted; and that the claim is barred by the discretionary function exception to the FTCA. The Banks responded by brief to the motion to dismiss and moved to strike the Agencies' alternative summary judgment motion. Both parties have since submitted briefs and evidentiary materials supporting their respective positions on the Agencies' motion. Since we have considered evidentiary matters outside the bounds of the pleadings we will treat this motion as one for summary judgment. *See J.M. Mechanical Corp. v. HUD*, 716 F.2d 190, 196–97 (3rd Cir.1983).

1. *The Statute of Limitations.*

Defendants raise the statute of limitations as their first defense. All tort claims against the United States must be brought to the attention of the appropriate federal agency within two years after the claim accrues. 28 U.S.C. § 2401(b) (1976). If the claim is denied, any further action by the claimant must be taken within six months of the denial. *Id.; see also* § 2675(a). Our task here, as in most limitations disputes, is to decide when plaintiffs' claim "accrued."

The United States Supreme Court has found that a claim accrues under 28 U.S.C. § 2401(b) when the injured party first becomes aware of both the existence of an injury and its cause. *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The Banks made their administrative claims on February 7, 1983. Thus, if the Banks knew about the sewage system's deficiencies before February 7, 1981, and knew these were the type of problems caused by shoddy construction, its suit here would be barred.

The Banks claim that they first learned of defects in the construction on April 21, 1981. On that day, Paul DeArment, Pennbank's officer overseeing the loans, met with members of the Authority, its solicitors, and an engineer independently retained by the Authority to inspect the sewage system. The engineer stated, according to Mr. DeArment, that the sewage system "was on the point of collapse." The

---

**2.** Congress has precluded the FmHA from spending any federal money on projects which pollute the environment. 7 U.S.C. § 1926(a)(10) (1976). Agency administrators felt that if the Pymatuning Citizens' allegations were sustained on appeal, the FmHA would be placed in the position of funding pollution. *See* Affidavit of Paul DeArment, Jr. Exhibit E.

engineer found that the sewer pipe was defective; that the pipe joints were leaking; that testing of the system's performance was careless and inaccurate; and that evidence pointed to collusion between the engineering company and the main contractor to conceal the defects until federal financing could be closed. *See* Affidavit of Paul DeArment, Jr. Exhibit F.

As one might expect of so serious a problem, it had not gone unnoticed before the April 21, 1981 meeting described by the Banks. A group of residents of the area served by the sewage system sued the Authority and its individual members in this court in 1979. *Pymatuning Water Shed Citizens For a Hygienic Environment v. Eaton,* supra. The residents brought suit under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1976) seeking a remedy for the alleged discharge of sewage sludge into the Shenango River and its tributaries. A large crowd of spectators attended the hearing in the United States Courthouse in Erie. Judge Knox ultimately found several violations of state water quality standards. In addition in his memorandum opinion handed down on August 14, 1980, he described an engineer's report which "revealed that the sagging of the pipe lines and the separation of the joints resulted from poor construction." 506 F.Supp. at 905. This is followed by a detailed description of the causes of these defects and what corrective steps had been taken. One of the corrections involved injecting chemical grout into leaky joints to seal them. It appears that the Authority was well aware of these leaks in March 1978 when it passed a resolution prohibiting such chemical grouting. 506 F.Supp. at 906. Furthermore, this legal battle did not end in the district court. The Pymatuning Citizens kept the controversy alive by their appeal to the Court of Appeals for the Third Circuit. *Pymatuning Water Shed Citizens For a Hygienic Environment v. Eaton,* 644 F.2d 995 (3d Cir.1981). The court affirmed the district court on a jurisdictional question in an opinion handed down on March 30, 1981.

Upon reviewing these opinions, we find it extremely difficult to believe that the Banks had no knowledge of the defects plaguing the sewage system until April 1981. The district court's opinion itself is one source of detailed information available eight months before that date. We would not, of course, require the Banks to keep abreast of litigation involving its borrowers by searching published opinions—though we would be surprised if the Banks claimed no interest in such opinions. The members of the Authority, however, certainly were other reliable sources of information. They were named defendants in the Pymatuning Citizens suit. They had the power to dispose of up to $6,000,000 in loans from the Banks. They were bound by the loan agreement to

> Promptly give notice in writing to the Lending Bank of all litigation affecting the Authority in which the amount is $5,000 or more, and of any dispute with, claim by or order or decree of any governmental or regulatory body which might substantially interfere with the normal operation of the Authority ... or the normal operation of the sewer system.

Complaint, Exhibit A at § H(a).

The Banks stretch their credibility to the limit by alleging that no information about serious flaws in the sewage system passed to them during the 21 month period the Pymatuning Citizens case was pending in our court and the court of appeals.

There is no doubt the Banks were aware of the litigation itself before April 21, 1981. Loan Officer Paul DeArment has attached three Bank documents to his affidavit referring to the Pymatuning Citizens lawsuit. Mr. DeArment wrote to an officer of First Seneca Bank on December 6, 1979 that "completion of the project was delayed by a legal action brought against the Townships by a group opposed to the sewer project." DeArment Affidavit, Exhibit A. In a memorandum to the Authority's credit folder dated November 12, 1980, Mr. DeArment recites that "[A] citizens group opposed to the project appealed to the Federal Court and ordered [sic] to have the project stopped." Id. Exhibit C. A similar

memorandum dated January 9, 1981 describes litigation pending against the Authority and discussed the Pymatuning Citizens suit in the Court of Appeals but does not elaborate on the subject of that appeal. Id. Exhibit D.

■ In general, banks do not have a reputation for being overly optimistic. But it appears here that, despite their awareness of a federal lawsuit and appeal, the Banks believed that their interests would be protected without making any inquiry into the subject of the litigation. They take the classic position of the piano player in the brothel. They expressed no interest in the condition of the sewage system until the security of their loans was undone, almost three weeks after the Authority was notified by the FmHA that it would not close Agency financing. The question is very close, but we must decide this challenge to the timeliness of the Banks' suit according to a presumption in their favor. On summary judgment, we must presume that the facts favor the non-moving party. We know the Banks were aware of litigation over the sewage system, but we have no direct evidence of the Banks' knowledge of actionable defects prior to April 21, 1981. The Banks receive a windfall from the presumption of facts in their favor, which shields them from being charged with knowledge prior to April 1981. We find, based on the pleadings before us, that plaintiffs' claim is not barred by 28 U.S.C. § 2401(b).

2. *The Misrepresentation Exception to the FTCA.*

■ As a sovereign, the United States is entitled to immunity from tort claims. Congress has, of course, waived this immunity by enacting the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (1976). Nevertheless, this waiver of immunity is limited. Among other tort claims excepted under the FTCA, the United States is not liable for "[a]ny claim arising out of ... misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). The

Agencies argue that any fault on their part must be construed as a misrepresentation; a suit based on such conduct is therefore barred. Plaintiffs respond that their action is based on the Agencies' failure to use reasonable care in exercising their duty to inspect and monitor construction of the sewage system. The fact that the Agencies also failed to report the true condition of the sewage system—negligent misrepresentation—does not defeat the Banks' claim for negligent inspection.

The Banks rely on *Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1982) to support their interpretation of the misrepresentation exception. In *Neal*, the owner of a new, FmHA financed home sued the Secretary of Agriculture under the FTCA.[3] After moving in, Ms. Neal discovered defects in the construction of her home which FmHA officials later confirmed. After receiving complaints, however, neither the builder nor the FmHA took action to correct the defects.

The Court ultimately held that the misrepresentation exception did not bar Ms. Neal's claim. The construction contract at issue required that the house conform to plans approved by the FmHA. The contract also granted the FmHA the right to inspect and test all materials and workmanship and reject any that were defective. The Court found that these rights created duties owed to Ms. Neal beyond any duty to use due care in reporting the results of FmHA inspections. "Neither the language nor the history of the [FTCA] suggests that when one aspect of the Government's conduct is not actionable under the 'misrepresentation' exception, a claimant is barred from pursuing a distinct claim arising out of other aspects of the Government's conduct." 460 U.S. at 298, 103 S.Ct. at 1094.

The Court thus appears to outline a formula for analyzing cases such as the one at bar. When the government invokes the misrepresentation exception, we must first decide whether plaintiff bases its claim on

---

**3.** The Secretary of Agriculture is authorized by 42 U.S.C. § 1471 *et seq.* to make housing loans to low income rural residents through the FmHA. His presence in that suit does not materially distinguish it from the case at bar.

misrepresentation. "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." 460 U.S. at 296, 103 S.Ct. at 1093. If we find misrepresentation, we know this "relieves the Government of tort liability for pecuniary injuries which are wholly attributable to reliance on the Government's negligent misstatements." 460 U.S. at 297, 103 S.Ct. at 1093–94. Thus if misrepresentation is the sole basis for the Banks' claim, it must fail. But regardless of whether we find misrepresentation, if we find negligence in certain other Agency conduct, the Banks' claim will survive, even though some of the legal and factual questions between misrepresentation and other tort actions overlap.

The Court of Appeals for the Third Circuit applied this formula in *J.M. Mechanical Corp. v. HUD,* 716 F.2d 190 (3d Cir. 1983). There, J.M. Mechanical was a subcontractor on a HUD-funded housing project. Under its regulations, HUD was charged with assuring that the owner of the project furnished surety bonds for payment and performance. HUD received such bonds, but later discovered that they were invalid. HUD took no action to replace the bonds, nor did it notify any of the contractors about the absence of adequate bonding. The general contractor subsequently defaulted under the terms of its construction contract. J.M. Mechanical sued the general contractor in state court and obtained a favorable judgment, but it was never satisfied. J. M. Mechanical then sued HUD for negligent enforcement of its bonding regulations.

The government argued there that J.M. Mechanical's claim was for misrepresentation no matter what other label the subcontractor had attached to its action. The court of appeals disagreed. It held that HUD had a duty to secure valid payment and performance bonds, a separate duty from any obligation to notify contractors about invalid bonds. Since J.M. Mechanical put forth a claim only partially based on

HUD misrepresentation, the court held that 28 U.S.C. § 2680(h) did not bar the action. *See also Cross Brothers Meat Packers, Inc. v. United States,* 705 F.2d 682 (3d Cir.1983) (United States held liable for negligent inspection where Department of Agriculture entered into contract to inspect meat for private firm). We must measure our case against those described above and *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) in which the Court outlined the scope of the misrepresentation exception in holding for the government.

Our first step in deciding the possible areas of negligence for which the Agencies may be liable is to determine the extent of their duties to the Banks. The Banks claim that the Agencies owed them a duty to perform a specific act: to inspect the sewer system with reasonable care. This duty must have an identifiable source. We will not hold these Agencies liable to private lenders for a general duty to inspect construction projects in which both parties have interests. In *Neal, supra,* for example, the FmHA's duties arose through its participation in a building contract. In *J.M. Mechanical, supra,* HUD regulations dictated its duty to obtain valid payment and performance bonds. Similar duties must arise here by statute, regulation, contract, or court decision for the Agencies to be held liable for negligent inspection.[4]

### a. *EPA regulations*

We will examine first the obligations of the EPA. Congress has provided for the EPA to administer federal grants for construction of water treatment plants, 33 U.S.C. § 1281 (1976), which of course explains the Agency's presence in this dispute. As part of the management of this grant money, EPA officials must approve "plans, specifications, and estimates for each proposed project for the construction of treatment works ..." 33 U.S.C. § 1283 (1976). We find no mention of any duty of

---

**4.** At the outset we find no evidence that the Agencies volunteered to inspect the sewer system on behalf of the Banks or any other party.

We therefore will not consider any voluntary assumption of this duty.

the EPA to inspect construction of treatment plants or sewer lines. On the contrary, the regulations in force at the time the EPA awarded its grant place the burden of inspection on the grantee. "In the case of any project involving Step 3, [that is, the construction of treatment works, 40 C.F.R. § 35.930–1 (1976)] the grantee will provide and maintain competent and adequate engineering supervision and inspection of the project to insure that the construction conforms with the approved plans and specifications." 40 C.F.R. § 35.935–8 (1976).

Other regulations illustrate the consistency of placing responsibility for inspection on the grantee, which ultimately enters the contracts and pays the bills. For example, before the EPA awards a waste treatment grant, the regional administrator must determine that the applicant "has the legal, institutional, managerial, and financial capability to insure adequate construction, operation and maintenance of the treatment works ..." 40 C.F.R. § 35.925–5 (1976). After a treatment plant is built, "The grantee must make adequate provisions satisfactory to the Regional Administrator for assuring economic, effective and efficient operation and maintenance of such works in accordance with a plan of operation approved by the State water pollution control agency ..." 40 C.F.R. § 35.935–12 (1976). We find further support in an EPA handbook published in 1976 entitled "How to Obtain Federal Grants to Build Municipal Wastewater Treatment Works", which plaintiff has supplied in its brief.[5] The provisions of this handbook are not legally binding, of course, and we do not consider them as such. After researching EPA regulations, however, we find this handbook to be a fair guide to what may be expected from the Agency's administration of waste treatment grants. Under the heading "On-Site Inspection," the handbook states that *"EPA or the State may* conduct on-site project inspections to insure that the project is being managed properly, is on schedule, and is being constructed in accordance with approved plans, specifications and change orders" (emphasis supplied). Plaintiff's Brief, Exhibit G § 14.8. The ambiguity of which body may conduct these inspections and how frequently, if at all, helps convince us that EPA regulations do not set out a duty to inspect by which the EPA could incur tort liability.[6]

### b. *FmHA regulations*

The FmHA's regulations mirror those of the EPA. Applicants for loans for "community facilities" such as waste treatment plans "must have ... the legal authority necessary for constructing, operating and maintaining the proposed facility or service and for the obtaining, giving security for, and repaying the proposed loan." 7 C.F.R. § 1933.17(a)(2)(iii) (1978).[7] This section of the regulations is "specifically designed for use by applicants including their professional consultant and/or agent." 7 C.F.R. § 1933.17(a) (1978). These provisions aimed at bodies like the Authority notify them in general terms that they bear the burden of executing a project that will perform as scheduled, one that will not be

---

5. We have relied on this handbook as evidentiary material and have accordingly ordered it filed.

6. The same section of the handbook and the regulations also provide for final inspection by the EPA, which involves more thorough examination of the sewer construction and its documentation. See 40 C.F.R. § 35.935–14 (1976). The Banks have no quarrel with the final inspection; it could not have been negligent since it revealed the problems at the heart of this dispute.

7. The court recognizes that the regulations cited appear in the Code of Federal Regulations for the years 1978 and 1979. The FmHA approved its loan commitment in January 1977, which means that the approval process primarily was subject to 1976 regulations. Construction of the sewage system was completed in April 1979. While the lag between the effective date of the regulations and the date of loan approval may be relevant, the mere absence of specific provisions in FmHA regulations prior to 1979 does not mean that the Agency recognized a duty to inspect before that time. We therefore will cite these regulations to illustrate the purpose of Agency inspections.

hindered by legal, financial, or practical problems. The FmHA certainly is bound to inspect construction of and monitor financing for any project involving FmHA loans. 7 C.F.R. § 1933.9(f) (1978). Other regulations make clear, however, that this does not relieve the borrower from taking steps to assure that the project will perform as expected. During the course of construction, for example, the borrower usually is required to make progress payments to contractors. But "[T]he review and acceptance of partial payment estimates by FmHA does not attest to the correctness of the quantities shown or that the work has been performed [sic] in accordance with the plans and specifications." 7 C.F.R. § 1933.17(a)(13)(vii) (1978). Finally and most significantly, under the heading "Development inspections", the regulations provide:

> The State Director will designate an FmHA representative to assist the County Supervisor in monitoring the construction of all projects being financed, wholly or in part, with FmHA funds. This assistance will include construction inspections and a review of each project inspection report, each change order and each partial payment estimate and other invoices such as payment for engineering and legal fees and other materials determined necessary to effectively monitor each project. These activities will not be performed on behalf of the applicant/borrower, but are solely for the benefit of FmHA and in no way are intended to relieve the applicant/borrower of his corresponding obligation to conduct similar monitoring and inspection activities.

7 C.F.R. § 1933.9(f) (1979).

Thus, in addition to finding that the Agencies have not been statutorily charged with a duty to inspect, we find that they have effectively disclaimed any implication of such a duty through their regulations.

### c. *The loan agreement*

The regulations cited above govern the relationship between the Agencies and the Authority. It may have been possible for the Agencies to assume additional duties through the loan agreement, but such is not the case. Only Pennbank and the Authority are parties to the agreement.[8] The loan agreement recognizes that the Agencies will provide long term financing. In addition, the Authority warrants that all plans and contracts for the project are subject to FmHA approval. See Complaint Exhibit A, § F(7) and (8) and G(2)(F) The Authority also warrants, however, that it is empowered to acquire, construct and operate a sewage system. The Authority is further bound to enter into "construction contracts for the complete construction of the Initial Construction Project with contractors which are financially responsible and have the resources, equipment, experience and ability to perform their obligations under said contracts...." Id. at § G(2)(a). The Banks' own language thus makes plain their expectations that the Authority would be responsible for the construction of the sewage system.[9]

This action by the Banks must fail because it portrays the Agencies in hats they do not wear. The Banks here attempt to thrust the Agencies into the role of construction supervisors. After reviewing how responsibilities for this project have been delegated by the statutes, regulations and agreements, we find that the Agencies involvement is chiefly financial. Their duty is to oversee the federal money being spent. They do examine plans and monitor construction, but as a safeguard against wasteful, negligent or illicit use of government money. The distinction we draw is between overseeing the money being spent on the work and overseeing performance of

---

**8.** Plaintiff First Seneca Bank obtained a participating interest in the loans by separate agreement with Pennbank.

**9.** We note that the Banks reserved the right to send their own representatives to inspect the sewage system. See Complaint, Exhibit A § H(5).

the work itself. The Agencies use inspections as a tool for fulfilling the former; they have not been made responsible, or accepted responsibility, for fulfilling the latter. No doubt this line occasionally blurs, but it is clear enough in this case to show that the Agencies had no actionable duty to oversee construction.

A hypothetical situation will illustrate the limited purpose of the Agencies' inspections and the ultimate reason why the Banks cannot escape being barred by the misrepresentation exception. Assume, arguendo, that a team of Agency inspectors discovered excessive infiltration and defective pipe joints during a development inspection. This discovery occurred in April 1978, a year before the project was finished. What then would be the Agencies' duties?

We conclude that the Agencies would be obligated to take the same course of action that they took in the case at bar: notifying the Authority that significant construction defects had been found and that Agency funding would be withheld pending corrective measures. EPA regulations provided for suspension or termination of grants for good cause; a sewage system that pollutes surrounding waterways would seem to qualify under this standard. 40 C.F.R. §§ 30.915 and .920 (1976). FmHA regulations likewise state that "If there is any indication that construction is not being completed in accordance with plans and specifications or that any other problems exist, the County Supervisor should notify the State Director immediately and withhold all payments on the contract." 7 C.F.R. § 1933.9(f) (1978). The key provision of these regulations is the Agencies' responsibility to *notify* the Authority of any funding changes.

Here lies the fundamental difference between this case and the cases on which plaintiffs rely, *Block v. Neal,* supra, and

*J.M. Mechanical v. HUD, supra.* We distinguish those cases because, in addition to their duties to inspect and to notify, those government agencies were charged with a duty to cure. In *Neal,* for example, the Court held that "FmHA's duty to use due care to ensure that the builder adhere to previously approved plans *and cure all defects* before completing construction is distinct from any duty to use due care in communicating information to respondent." 460 U.S. at 297, 103 S.Ct. at 1094 (our emphasis). The Court of Appeals likewise found in *J.M. Mechanical* that "JM's claim is based on the failure of the government to secure new bonds, not on the government's failure to tell JM of the failure of the original bonds." 716 F.2d at 195. These cases demonstrate that when the government has the power to correct mistakes directly, it should use that power and is negligent when it does not.

Here, the Agencies had no power, thus no duty, to cure defects. They were not party to construction contracts. They had no authority over the contractors and engineers once plans had been approved.[10] They were not entitled to order the contractors to perform certain work or to correct any defects. They could have directed the Authority to have defects corrected, as they ultimately did, but this duty relies on communication to the Authority. This communication—or lack of it—implicates the misrepresentation exception.

### CONCLUSION

The FmHA and the EPA were entitled to periodically inspect the construction work only to better control the purse strings. This view is consistent with the overall picture of the Agencies as funding sources, not construction managers. For the Agencies to inspect the sewage system, or be entitled to inspect it, and fail to notify the Authority of the true, defective condi-

---

**10.** The agencies conceivably could have required plan changes if they had found defects in documents or blueprints. But even the most

scrutinized plans have little value when the builder does not follow them. Good planning does not insure good construction.

tion of the construction is to misrepresent it as acceptable. Agency communication thus is essential to the Banks' claim. We have found no possible Agency duties to the Banks other than the duty to notify the Authority of any funding changes. This includes notice about the discovery of significant construction defects, which intimately affects scheduled funding. The Agencies never provided this notice. The Banks claim thus can only be construed as one for negligent misrepresentation, which is barred by 28 U.S.C. § 2680(h). We need not address defendants' other arguments.

We will enter an order consistent with this opinion.