**CITIZENS COORDINATING COMMITTEE ON FRIENDSHIP HEIGHTS, INC., et al.**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant.**

**No. 84–5174.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1985.

Decided July 5, 1985.

As Amended July 5, 1985.

See also, D.C., 568 F.Supp. 825.

Frank R. Filiatreau, Jr., Washington, D.C., with whom Robert L. Polk, Washington, D.C., was on brief, for appellant. William B. Bircher, Washington, D.C., entered an appearance for appellant.

Waldemar J. Pflepsen, Jr., Washington, D.C., was on brief, for appellees.

Before TAMM and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This case involves the question whether a corporation alleging aesthetic injury and damages under common law tort theories, under which it would not be entitled to recover litigation costs, can, by joining a suit under section 505 of the Clean Water Act, 33 U.S.C. § 1365 (1982), claim reimbursement of costs, including attorneys' fees and expert witness expenses.

## I.

The Washington Metropolitan Area Transit Authority ("WMATA") bus yard facilities located in the Friendship Heights neighborhood of the District of Columbia include an underground fuel storage tank system. Prior to 1978 this system had leaked large quantities of diesel fuel, creating an underground plume of the fuel. By January, 1978, the plume had reached the WMATA subway tunnel and station at Friendship Heights. The fuel entered the ground water collection sump in the tunnel near Drummond Avenue in Maryland, a short distance from the subway station. This collection sump, in turn, emptied into the Little Falls Branch, a stream running through Friendship Heights and the Town of Somerset, Maryland.

WMATA had also allowed oil, diesel fuel, and other pollutants to run into the Jeniver Run storm sewer. This storm sewer, once a free flowing surface stream, transports its contents to the Little Falls Branch. WMATA has never obtained a permit to discharge pollutants into Little Falls Branch.

By July 1981, the diesel fuel plume reached the ground water collection system beneath the Mazza Gallerie shopping mall and entered the system's sump tank.[1] The

---

1. Mazza Gallerie is located across the street from the WMATA bus yard. The mall is owned by appellees 5300 Wisconsin Avenue Joint Venture, a joint venture of the Prudential Insurance

Company of America and Finsbury Properties, Inc. Appellees will be referred to herein as "Mazza Gallerie."

sump was designed to discharge into the Jenifer Run storm sewer. To prevent pollution of the storm sewer, Mazza Gallerie had to pump out the diesel fuel and haul it away in tank trucks. Diesel fuel also continued to collect in one of the mall's elevator pits, causing an offensive odor. Mazza Gallerie had to install an auxiliary sump pump system and also replace certain elevator equipment.

In October, 1981, Mazza Gallerie made demand upon WMATA for reimbursement of expenses incurred in remedying the pollution of its property. Record Excerpts ("R.E.") at 97. These demands were reiterated in December, 1981, along with a demand that WMATA cease polluting Mazza Gallerie's property. R.E. at 95–96. It is noteworthy that Mazza Gallerie did not complain of pollution to Little Falls Branch or any pollution that would constitute a Clean Water Act violation. Nor did Mazza Gallerie ever serve the notice required by the Act before a suit may be filed for a violation.

On January 8, 1982, however, the Town of Somerset, Maryland, Citizens Coordinating Committee on Friendship Heights, Inc., Mr. and Mrs. Matthew Fink, and Mr. and Mrs. Amos T. Wilder served notice pursuant to section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b) (1982), of the pollution of Little Falls Branch without permits required by law. R.E. at 8–17. At the end of the mandatory 60-day notice period, these parties filed suit in district court alleging violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) (1982), common law negligence, trespass, and nuisance. Mazza Gallerie joined as a party plaintiff, thus, for the first time, purporting to assert a right under section 505 as well as asserting common law tort claims. The complaining parties, including Mazza Gallerie, sought damages, injunctive relief, civil penalties and costs, including attorneys' fees. But Mazza Gallerie's only specific request for relief—reimbursement for costs associated with the pollution of Mazza Gallerie property—related to the tort claims and not to Clean Water Act violations. R.E. at 18–30.

After suit was filed, the parties began negotiations aimed at settlement. To assist in the negotiations, both sides engaged expert assistance. The expert hired by the plaintiffs was paid by Mazza Gallerie, allegedly because it was the only plaintiff capable of assuming this expense.

Eventually, on October 4, 1982, the parties entered into a court approved consent decree, which required WMATA to prevent discharges into Little Falls Branch and restore that stream to its pre-discharge condition. R.E. at 36–54. The decree also required WMATA to pay damages caused by the migration of oil into Mazza Gallerie's property. The decree further provided that WMATA would "pay to the Plaintiffs their costs of litigation (including reasonable attorney and expert witness fees) in accordance with Section 505(d) of the Clean Water Act." R.E. at 50. It was clear, therefore, that the decree left the law of costs where it was: costs were recoverable for litigation about Clean Water Act violations but not for the litigation of tort claims. The plaintiffs filed motions for those costs.

With respect to the citizen plaintiffs, WMATA contested only the reasonableness of the number of hours and hourly rates charged. The district judge awarded $60,-936.79 of the $71,926.40 requested. R.E. at 137–38. However, WMATA challenged the entire request of Mazza Gallerie for $21,-115.07. This amount included $8,988.07 for expert witness costs, and the remainder for other costs and attorneys' fees. WMATA argued that the district court lacked jurisdiction over Mazza Gallerie's claims under the Clean Water Act, since Mazza Gallerie was not a "citizen" under the Act, and therefore did not have standing to sue. Mazza Gallerie contended that it had standing because it had suffered "injury in fact" by virtue of the diesel fuel leaking onto its property and that it had also suffered aesthetic injury. It claimed, in any event, that the Clean Water Act provided for awards of cost to "any party." Even if it was only a pendent party, therefore, it should receive its costs. R.E. at 104–19.

The district court agreed that Mazza Gallerie had suffered actual injury because "there has been damage to the aesthetic atmosphere of the surrounding Friendship Heights community, making their property less desirable. In addition, because of the consent decree, the Mazza plaintiffs will enjoy the benefits of added attractiveness to the area surrounding the gallerie." R.E. at 148. After some adjustments, the district judge awarded $19,994.57 of the $21,115.07 requested. *Id.* at 154–57. It is from this award that WMATA appeals.

## II.

Section 505(a) of the Clean Water Act provides that,

*any citizen* may commence a civil action on his own behalf—

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,....

33 U.S.C. § 1365(a) (1982) (emphasis added). A "citizen" is defined by the Act as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).

■ The legislative history of the Act indicates that Congress intended to use the "injury in fact" rule for standing as defined in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). S.Conf.Rep. No. 1236, 92d Cong., 2d Sess. 146, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3776, 3823; *see Montgomery Environmental Coalition v. Costle*, 646 F.2d 568, 576–77 (D.C.Cir.1980). To have standing under the Clean Water Act, therefore, a party must allege a specific injury to his interest that can be redressed by the statute. In the complaint, Mazza Gallerie alleged the following injuries:

Because the Mazza Gallerie is a shopping center whose reputation and attractiveness to customers stems from the attractive condition of its surrounding, including the Little Falls Branch, [Mazza Gallerie has] been damaged by defendant's unlawful pollutant discharges. [Mazza Gallerie has] also been damaged as a result of the seepage of ground water contaminated with diesel fuel into the basement of the Mazza Gallerie as a result of defendant's operation of the bus yard....

....

[Mazza Gallerie has] been damaged because the area in which the Mazza Gallerie is situated has become less pleasant and attractive.

R.E. at 21, 25. Mazza Gallerie thus claimed injury from the pollutant discharges into a stream approximately half a mile from its premises and from seepage of pollutants into its basement. We think it had standing under the Clean Water Act to complain of neither.

It might be contended that Mazza Gallerie had standing to complain of discharges into the stream as an economic injury. Perhaps that would have been so but Mazza Gallerie has consistently treated this allegation as noneconomic, as claiming aesthetic damage. Nowhere in the paragraph cited or elsewhere in the complaint does Mazza Gallerie state actual damages, that it has lost business, that any customer chose not to shop at the mall, or that the value of its property had declined. No money damages were claimed for the discharge into Little Falls Branch. Moreover, the district court did not treat this allegation as one of economic injury but rather as one of aesthetic injury. That is also the way Mazza Gallerie argues the case to us.

WMATA now argues, for the first time, that the injury to the interest of the Joint Venture fails to meet this "zone of interest" test, allegedly because "neither the complaint nor Mazza Gallerie's Motion alleged or referred to any loss of business or profits as a result of the discharge into Little Falls Branch." Brief at p. 9.

This argument, however, disregards the very teachings of the *Sierra Club* case in which the Court clearly recognized that injury to interests of a noneco-

nomic nature that are widely shared could form the basis of a claim under the environmental laws. *See United States v. SCRAP*, [412 U.S. 669, 686 (1973)]. Thus, it was not necessary for the Joint Venture to allege, nor for the district court to find, any loss of business or profits. On the other hand, the Joint Venture did clearly allege, and the district court so found, that injury to noneconomic interests cognizable under the Clean Water Act was occurring.

Brief for Appellees at 18–19 (footnote omitted).

Though Mazza Gallerie is correct in pointing out that the Supreme Court in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), held that individuals have standing under *Sierra Club v. Morton* when they allege aesthetic injury, we are unwilling to extend that ruling, incongruously, to conclude aesthetic harm to corporate entities. Aesthetic injury presupposes the ability to sense one's surroundings. *See, e.g., Gonzalez v. Gorsuch*, 688 F.2d 1263, 1266 (9th Cir.1982) ("Plaintiff's interest as one who *uses* and *enjoys* the bay is sufficient to meet the [standing requirements]" (emphasis added).). Though a corporation is a person for some purposes, we would be most reluctant to hold that it has senses and so can be affronted by deteriorations in its environment. That is beyond the reach of legal fiction and belongs in the realm of poetic license.[2] We need not decide whether, had Mazza Gallerie alleged economic injury to itself due to aesthetic injury to others, it would have had standing. That is not how Mazza Gallerie or the district court construed the complaint's allegations, and we have no obligation to construe those allegations differently in a gratuitous attempt to cure their deficiencies. The theory of noneconomic injury to Mazza Gallerie does not confer standing.

■ Mazza Gallerie's other alleged injury is also insufficient to establish standing under the statute. The test is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 830, 25 L.Ed.2d 184 (1970); *see also Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). There is little doubt that Mazza Gallerie has suffered injury in fact from the seepage of diesel fuel into its ground water collection system and elevator pit. The Clean Water Act, however, was enacted not to create a federal tort of subterranean trespass but to protect navigable rivers and streams from pollution, and to require those who desire to discharge pollutants into the waterways to obtain a permit for doing so. The allegation of fuel seepage into Mazza Gallerie's basement was a trespass, actionable at common law, and not pollution of a stream without a permit, actionable under the Clean Water Act.[3] Pollution covered by the Act is of the type for which a permit may be sought. No one suggests WMATA could have sought a permit that would allow it to continue the pollution of the mall's basement. That pollution was not a violation of "an effluent standard or limitation." S.Rep. No. 414, 92d Cong., 1st Sess. 79, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3745 ("[T]he [citizen suits'] provision in this bill is *carefully restricted* to actions where violations of *standards* and *regulations* or a failure on the part of officials to act are alleged" (emphasis added).). It gave rise only to common law tort claims, and it is clear that attor-

**2.** As in the poem, CORPORATE ENTITY

\*   \*   \*   \*   \*

The Oklahoma Ligno and Lithograph Co
Weeps at a nude by Michael Angelo.
A. MacLeish, *Collected Poems 1917–1952*, at 22 (Boston, Houghton Miffin Co. 1952).

**3.** Mazza Gallerie argues that because its basement was part of the trail to the Jenifer Run storm sewer which feeds into the Little Falls Branch, its damage relates to the pollution of a navigable waterway under § 505. This argument fails to recognize that § 505 only requires one to obtain a permit before polluting a waterway. The Act does not require a permit for all leaks. The seepage into Mazza Gallerie's basement came before and was not caused by pollution into a waterway.

neys' fees and other costs of litigation are not recoverable in such actions. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

■ Mazza Gallerie argues that even if it does not have standing under the Act, the Act provides for award of the costs of litigation to "any party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d) (1982). It interprets this as meaning that the court in its discretion can award costs and attorneys' fees to parties who have joined pendent claims. This is too broad a reading of the statutory language. The only time an award would be appropriate is to the extent the costs were incurred in furtherance of the section 505 claim. To award costs in any claim joined to the section 505 action, regardless of its nature, would allow plaintiffs to join regular tort actions to Clean Water Act claims or simply allege such claims in order to receive costs not normally allowed. We do not believe this to have been Congress' intent. *Cf. Save Our Sound Fisheries Association v. Callaway,* 429 F.Supp. 1136, 1140–41 (D.R.I.1977).

■ Mazza Gallerie offers an additional theory for recovering at least expert witness costs. The district court found that the expert, paid by Mazza Gallerie, was essential to the section 505 claim and that the citizen plaintiffs, who did have standing under that section could have recovered these costs and reimbursed Mazza Gallerie. Perhaps that could have been done, but it was not. The expert was valuable to Mazza Gallerie in establishing its tort claim against WMATA. The expert was also valuable in establishing the Clean Water Act claim, but Mazza Gallerie had no standing under the Act and those plaintiffs who did have standing did not employ the expert. We cannot award the cost of the

expert to Mazza Gallerie simply because his testimony also assisted the proper party's Clean Water Act claim. If the expert was valuable to both claims, Mazza Gallerie should not be able to recover the entire cost. It could recover only that portion of the expert's cost that assisted the other claimants' section 505 claim, and then, solely by reimbursement from those parties who had standing. That would have been equivalent to a loan from Mazza Gallerie to the other plaintiffs of their portion of the costs and would have required that they apply for recovery of their portion in order to repay Mazza Gallerie. Instead, we have the wrong party applying for all of the costs, some of which are attributable to the tort claims. We think courts ought not remake the parties' arrangements.[4]

We reverse the district court's award of attorneys' fees and other costs of litigation.

*It is so ordered.*

---

**4.** We also have some doubt that Mazza Gallerie paid the expert fee for the § 505 claim because the other claimants could not afford it. The citizen plaintiffs were able to pay slightly less than $72,000 in attorneys' fees as shown by their request. Brief for Appellees at 8. The expert

fee was just under $9,000. Clearly claimants were prepared to expend a significant sum to try their case and it would be peculiar to assume they would be willing to expend that much but go without an expert seen as essential to their cause.