**AMERICAN CANOE ASSOCIATION, INC., et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, Defendant.**

**No. CIV.A.99–02798(HHK).**

United States District Court, District of Columbia.

March 2, 2004.

David G. Bookbinder, Sierra Club, Joseph Mendelson, III, International Center for Technology Assessment, Washington, DC, for Plaintiffs.

Benjamin F. Wilson, Beveridge & Diamond, P.C., David Michael Williamson, Beveridge & Diamond, P.C., Washington, DC, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

This action is brought under the citizen suit provision, 33 U.S.C. § 1365, of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251–1387. Plaintiffs American Canoe Association, Inc., Potomac Conservancy, Inc., and Canoe Cruisers Association of Greater Washington, Inc. (collectively "plaintiffs") charge that the District of Columbia Water and Sewer Authority ("WASA"), an independent authority of the District of Columbia government, has violated the terms and conditions of a permit, National Pollutant Discharge Elimination System ("NPDES") permit number DC0021199 ("Permit"), issued to WASA by the Environmental Protection Agency ("EPA") to operate the Potomac Interceptor Sewer and Upper Potomac Interceptor Relief Sewer. Alleging that these permit violations have resulted in the emission of hydrogen sulfide from the sewers, plaintiffs seek injunctive and other relief. Before the court are the parties' cross-motions for summary judgment [Docket ## 61, 65]. Upon consideration of the motions, the respective oppositions thereto, and the record of this case, the court concludes that defendant's motion for summary judgment must be granted and plaintiffs' motion for summary judgment must be denied.

## I. BACKGROUND

### A. Clean Water Act

In passing the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, Congress established a comprehensive regulatory scheme to control the discharge of waste and pollutants into the nation's navigable waters. The Act's objective is to "restore and maintain the chemical, physical, and biological integrity of the Nation's

waters." 33 U.S.C. § 1251. The CWA makes unlawful any pollutant discharges into navigable waters, except as authorized by other provisions of the CWA, 33 U.S.C. §§ 1311(a), 1342, and requires the promulgation of effluent limitations which set the maximum allowable quantities, rates and concentrations of different pollutants that may be discharged into waters. 33 U.S.C. § 1362(11). The EPA enforces the CWA through the National Pollutant Discharge Elimination System, under which the EPA has the discretion to issue permits, or delegate that power to states, for the discharge of otherwise prohibited effluents, after a public hearing and subject to conditions set by the EPA. 33 U.S.C. § 1342(a)(1).

While the EPA and states generally enforce NPDES permit terms, private citizens may also enforce the CWA: "[A]ny citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter ...." 33 U.S.C. § 1365(a). The CWA defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Further, under the citizen suit provision, "effluent standard or limitation" includes "a permit or condition thereof issued under section 1342 [the NPDES permitting regime]." 33 U.S.C. § 1365(f)(6).

**B. Factual Background**

WASA operates the Blue Plains Sewage Treatment Plant ("Blue Plains"), Potomac Interceptor Sewer ("PI"), and Upper Potomac Interceptor Relief Sewer ("UPI"), which together carry sewage from the District of Columbia and Loudoun, Montgomery, and Fairfax Counties, to Blue Plains for treatment. There are approximately 34 vents installed along the PI and UPI sewer mains. The EPA issued a NPDES permit to WASA on January 22, 1997 to operate the Blue Plains sewage collection system and related sewer interceptors and overflows. *See generally* Def.'s App. at 228–84 (NPDES Permit No. DC0021189, Jan. 22, 1997) ("1997 Permit"). Section II.B.1 of the permit ("M & O Clause") requires WASA to:

> properly operate, inspect and maintain all facilities and systems of treatment and control (and related appurtenances including sewers, intercepting chambers, interceptors, combined sewer overflows, pumping stations and emergency bypasses) which are installed or used by the permittee to achieve compliance with the conditions of this permit.

*Id.* at 19.

Plaintiffs claim that WASA has violated, and continues to violate, its 1997 Permit and, therefore, puts it in violation of 33 U.S.C. § 1342, which constitutes the NPDES program. More specifically, plaintiffs allege violation of the 1997 Permit's M & O Clause because WASA has failed to fulfill its obligation to the National Park Service ("Park Service" or "NPS") to install "odor controlled carbon filters" on vents located on Park Service property. Compl. ¶ 18. Because most of the PI and UPI sewer vents are "not equipped with any sort of filtration system or other means of controlling hydrogen sulfide emissions," WASA is in violation of its permit. Furthermore, plaintiffs contend that the PI and UPI vents have emitted and continue to emit, intermittently, hydrogen sulfide, which directly and adversely affects the "health, economic, recreational, aesthetic and environmental interests" of plaintiffs and their members. *Id.* ¶ 12.

On August 6, 1999, plaintiffs wrote WASA, the EPA, and other local and federal authorities to provide notice of the alleged violations and of plaintiffs' intent to pursue a citizen suit in federal district court. *See* Compl. at Ex. 1 (Bookbinder

Ltr. to Williams, Linton & Johnson, Aug. 6, 1999). Shortly thereafter, on October 22, 1999, plaintiffs filed the present suit seeking a declaratory judgment that WASA has violated and continues to violate its permit and the CWA, an injunction against further violations, an order requiring WASA to conduct monitoring of the PI and UPI sewer vents, appropriate civil penalties, and attorneys' and expert witnesses' fees.

In December 1999, WASA filed a motion to dismiss on the grounds that (1) plaintiffs had no Article III standing to bring a suit, Def.'s Mot. to Dismiss at 7–18; (2) plaintiffs failed to state a claim upon which relief can be granted, *id.* at 18–23; and (3) the statute of limitations barred plaintiffs' action. *Id.* at 23–25. In its November 19, 2000 order, this court denied WASA's motions to dismiss. *Am. Canoe Ass'n v. Dist. of Columbia Water & Sewer Auth.*, No. 99–2798, slip op. at 12 (D.D.C. Nov. 19, 2000) ("Nov.2000 Order") [Docket # 19]. After engaging in discovery, the parties filed the cross-motions for summary judgment presently before the court.

## II. ANALYSIS

### A. Legal Standards

#### 1. Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

#### 2. Effect of Previous Motion to Dismiss

A previous motion to dismiss, granted or denied, may have an effect on a subsequent motion for summary judgment. In general, "[t]he ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2713 at 233 (2d. ed.1998); *see also Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 (D.C.Cir.1987) ("In sum, while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff."). However, a summary judgment motion "may not be made on the same grounds and with the same showing that led to the denial of a previous motion to dismiss." *See id.* (citing *Mayer v. Distel Tool & Mach. Co.*, 556 F.2d 798 (6th Cir.1977)). Even if different language is

used in a summary judgment motion than in a previous motion to dismiss, so long as the same legal theory supports both motions, the denial of the motion to dismiss serves as the law of the case [1] and on these grounds, a court may deny a motion for summary judgment. *See In re Midwest Milk Monopolization Litig.*, 380 F.Supp. 880 (D.Mo.1974).

## B. Jurisdiction

■ Jurisdiction is a threshold matter without which this court has no authority to decide other potentially dispositive issues in this case. *See Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 757 (D.C.Cir.1987) (Green, J., concurring) (holding that "lower courts must always wrestle with [jurisdictional issues] before reaching any questions of justiciability, since courts may not decide issues over which they lack jurisdiction"); *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C.Cir.1981) ("The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds."); *Am. Farm Bureau v. EPA*, 121 F.Supp.2d 84, 91 (D.D.C.2000) ("The court must address the issue of jurisdiction as a threshold matter, because absent jurisdiction the court lacks the authority to decide the case on any other grounds."). Therefore, before considering the parties' cross-motions for summary judgment on the merits, the court must consider the two jurisdictional issues raised by WASA-notice and standing. The notice argument did not appear in WASA's motion to dismiss. The standing argument was denied in the court's previous order, *see* Nov. 2000 Order at 3–9, but the issue merits further discussion because WASA introduces new evidence and cites new cases decided after the court's order.

## 1. Notice

■ The CWA's citizen suit provision requires that a plaintiff provide notice to alleged violators of the Act and provide them 60 days to respond before bringing suit. 33 U.S.C. § 1365(b). Federal regulations require that the notice letter include certain items, including *inter alia,* "sufficient information to permit the recipient to identify the specific requirement alleged to have been violated" and "the date or dates of such violation." 40 C.F.R. § 135.12(a). Strict compliance with this provision is a mandatory jurisdictional prerequisite for a citizen suit. *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 175 F.Supp.2d 1071, 1077 (E.D.Tenn.2001). WASA claims that plaintiffs provided defective notice before bringing the present suit. Specifically, WASA alleges that plaintiffs notice letter failed to provide specific information on (1) the dates of alleged violations and (2) pollutants discharged unlawfully. These arguments are without merit.

■ First, WASA alleges that plaintiffs fail to identify precise dates on which odors were emitted from the PI. Plaintiffs notice letter alleged that WASA "has and continues to violate" its NPDES permit by failing to maintain vents and vent filters on the Potomac Interceptor. *See* Def.'s App. at 1287–88 (Bookbinder Ltr. to Williams, Linton & Johnson, Aug. 6, 1999). Reference to ongoing violations is sufficiently specific notice. *See Natural Resources Def. Council, Inc., v. Southwest Marine, Inc.*, 236 F.3d 985, 996 (9th Cir.2000) (hold-

---

1. " 'Law-of-the-case doctrine' refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided ... by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation*, 49 F.3d 735, 739 (D.C.Cir.1995). However, this doctrine is "a prudential rule rather than a jurisdictional one." *Id.* at 739–40.

ing that allegation of ongoing wrongdoing, a failure "to prepare and implement plans that were required by ... permit," provided defendant sufficient notice of specific date under 40 C.F.R. § 135.3(a)). WASA cites one case in which a notice letter containing allegations of repeated, if intermittent, emissions was deemed insufficient warning for the purposes of a regulation analogous to 40 C.F.R. § 135.12(a). *See* Def.'s Mot. for Summ. J. (citing *Nat'l Parks Conservation Ass'n*, 175 F.Supp.2d at 1077 (analyzing similar regulation, 40 C.F.R. § 54.3(b), promulgated pursuant to the Clean Air Act)). That case, however, is distinguishable. While the hydrogen sulfide odor emanating from the PI's vents is intermittent, plaintiffs' notice letter alleged an ongoing, and likely future, failure to properly maintain carbon filters on vents. Def.'s App. at 1288 (alleging past and continuing failure to properly operate and maintain vents on the PI and UPI). The plaintiffs in *National Parks Conservation Association*, by contrast, alleged no such ongoing, current failure to act but, instead, alleged discrete, past emissions violations without identifying dates, though exact dates were critical to determining whether Clean Air Act violations had occurred at all. *See* 175 F.Supp.2d at 1076 (noting allegations of over 6,000 discrete violations of an air-opacity requirement of the Clean Air Act without the identifying particular dates, while the relevant permit excused such violations under certain factual situations and allowed unexcused violations 2% of the time). Plaintiffs' letter, therefore, provided WASA sufficient notice of the specific dates of violation.

■ Second, WASA argues that plaintiffs' letter failed to provide notice of the effluents WASA allegedly discharged in violation of its permit. Plaintiffs, according to the relevant regulation, must identify "the specific requirement alleged to have been violated." 40 C.F.R. § 135.12(a). *See also* 40 C.F.R. § 135.3(a)

(requiring notice letter from plaintiff to include "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated"). Nothing in § 135.12(a) requires a plaintiff's notice letter to identify specific effluents or pollutants when the complaint does not allege violations of effluent limitations. Yet WASA cites *Catskill Mountains v. City of New York*, 273 F.3d 481 (2d Cir.2001), out of context by claiming that it holds that *all* notice letters must identify specific effluents. *See* Def.'s Mot. for Summ. J. at 55 (citing 273 F.3d at 488). Rather, the case merely indicates that if a plaintiff alleges effluent limitation violations, her notice letter must identify particular effluents. *See Catskill Mountains*, 273 F.3d at 488. Notice is not proper if the letter generally alleges illegal discharges without naming specific substances. *Id.* at 487. *Catskill Mountains* says nothing about how specific notice must be when a citizen suit is brought to stop violations of non-effluent portions of a NPDES permit. *See generally* 273 F.3d 481. In this case, plaintiffs' notice letter clearly identified the harm they suffered, Def.'s App. at 1288 (alleging emission of hydrogen sulfide) and the specific permit provision they believe WASA violated. *Id.* at 1287–88 (alleging violation of the M & O clause, citing specifically to 1997 Permit at 19).

■ WASA claims that plaintiffs' letter did not indicate "what would constitute compliance," but neither § 135.12(a) nor case law requires that a notice letter identify a technical solution to the violation. A notice letter need not tell an alleged violator "what would constitute compliance." *See* Def.'s Mot. for Summ. J. at 56. Rather, § 135.12(a) merely gives alleged CWA violators the *opportunity* to "identify its own violations and bring itself into compliance voluntarily, thus making a costly law-

suit unnecessary." *Catskill Mountains,* 273 F.3d at 488. Plaintiffs' letter sufficed to give WASA proper notice and the opportunity to "bring itself into compliance" as required by federal regulations.

## 2. Standing

In its motion for summary judgment, WASA raises arguments which are variations on a theme it presented in its motion to dismiss-that plaintiffs have no standing to sue under the Clean Water Act because their claim is unrelated to the purposes of the Act, which regulates water quality. *See* Def.'s Mot. to Dismiss at 9 ("The disconnect between air emissions and waters protected by the Clean Water Act prevents [plaintiffs] from suing under the Clean Water Act ... because ... a complaint about odor is simply not a Clean Water Act case ...."); *id.* at 10–11 ("[T]o be actionable, plaintiffs' allegations must implicate the purpose of the NPDES program, which is to regulate discharges of pollutants into national waters."). In the present iteration of this "zone of interests" argument, WASA provides factual materials and new cases to support its argument. Instead of explicitly raising standing as a jurisdictional issue, however, WASA requests summary judgment on the merits. Specifically, WASA argues that (1) the EPA has no authority or intent to regulate odor, Def.'s Mot. for Summ. J. at 33; (2) nuisance actions are not cognizable under the CWA, *id.* at 52; (3) an implied odor requirement would violate the Due Process Clause, *id.* at 38–44; and (4) the 1997 NPDES Permit does not require odor control.

■ However repackaged, these arguments are based on a theory the court has invalidated. *See* Nov. 2000 Order at 3–9. Further, WASA presents new facts that are immaterial and new cases that are inapposite. The court must, therefore, deny all grounds for summary judgment based upon WASA's old standing argument. The court, having established the law of the case in its previous order, may deny arguments based on old standing grounds. *See* 10A WRIGHT, MILLER & KANE, FED. PRAC. & PROC.: CIVIL. 3D § 2713 at 233; *Midwest Milk,* 380 F.Supp. at 883. Nevertheless, even after revisiting the issue, the court determines that WASA's arguments do not support summary judgment in its favor. Simply, the CWA allows citizen suits to enforce any NPDES permit provision, whether or not the provision directly regulates water quality.

The court previously denied WASA's motion to dismiss and held that plaintiffs had Article III standing under the CWA, 33 U.S.C. § 1365(f), to challenge any conditions of an NPDES permit, whether or not they state effluent limitations. *See* Nov. 2000 Order at 6–9. In finding plaintiffs' claims to be inside the zone of interests protected by the Clean Water Act, the court's previous order was based on two rationales, neither of which WASA directly challenges in its current summary judgment motion. First, it is well-established that whether a claim is within the zone of interests protected by a statute is to be evaluated "not by reference to the overall purpose of the Act in question, ... but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear,* 520 U.S. 154, 175–76, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) *cited in* Nov. 2000 Order at 6. That the Act's *overall* purpose is to regulate water quality is irrelevant. What matters is that a plaintiff identifies a "particular provision of law" within the Act. *Id.*

Second, the court found that plaintiffs had standing because they alleged violation of a specific provision of the CWA. Nov. 2000 Order at 7. Plaintiffs invoked 33 U.S.C. § 1365(a)(1) and § 1342, and a plain reading of these statutes together indicates that a citizen may sue for any viola-

tion of an NPDES permit. *See id.* 7–8 & n. 4. Further, the court found, *id.,* that a body of persuasive authority supported this reading of the statutes. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 152 (4th Cir. 2000) (en banc) (finding that 33 U.S.C. § 1365(f) allows citizen suits for "any term or condition of an approved [NPDES] permit"); *Northwest Envtl. Advocates v. City of Portland,* 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of [§ 1365] authorizes citizens to enforce all permit conditions"); *Conn. Fund for Env't v. Raymark Indus., Inc.,* 631 F.Supp. 1283, 1285 (D.Conn.1986) (Cabranes, J.) ("There is nothing in the language or legislative history of the [Clean Water Act] to suggest that a citizens' suit may seek to enforce only those conditions of an NPDES permit that regulate the quality of a discharge immediately before its release into navigable waters."); *Locust Lane v. Swatara Township Auth.,* 636 F.Supp. 534, 537–38 (M.D.Pa.1986) (holding that plaintiffs had standing to enforce permit provision that set a schedule for the construction of wastewater treatment facilities); *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton,* 506 F.Supp. 902, 908 (W.D.Pa.1980) ("Inasmuch as we have found violations of the NPDES permit it is unnecessary to determine whether plaintiffs have proved violations of effluent standards or limitations under ... 33 U.S.C. § 1311 or any other section of the Clean Water Act.").

While WASA does not challenge these cases, WASA challenges the court's finding on several other grounds. WASA asks the court to reconsider its previous decision to decline to follow *Citizens Coordinating Comm. on Friendship Heights, Inc. v. Washington Metro. Transit Auth.,* 765 F.2d 1169 (D.C.Cir.1985) ("Friendship Heights"). *See* Nov. 2000 Order at 8–9 (evaluating and distinguishing inapposite Friendship Heights case). WASA argues

that *Friendship Heights* controls, and that the factual distinction made in the previous order was erroneous. *Id.* ("[T]he *Friendship Heights* plaintiff did allege the same type of [CWA] violation as Canoeists allege here. The Court should recognize that the claims in both cases are common-law tort claims ... dressed in sheep's clothing of a[CWA] citizen suit."). This court held that plaintiffs in the present action had clearly alleged a violation of an "effluent standard or limitation"-namely the M & O Clause of the 1997 Permit. *See* Nov. 2000 Order at 9.

The court's previous decision on this issue stands, though the court's analysis of *Friendship Heights* merits some elaboration. Simply put, *Bennett* supercedes *Friendship Heights*-at least as WASA understands the latter case. In *Friendship Heights,* the D.C. Circuit, in finding that the court had no jurisdiction to consider a claim involving the seepage of diesel fuel into a mall's basement, made reference to the general purpose of the CWA. *See Friendship Heights,* 765 F.2d at 1173 ("The Clean Water Act, however, was enacted not to create a federal tort of subterranean trespass but to protect navigable rivers and streams from pollution ...."). However, *Bennett* bars precisely the sort of reasoning *Friendship Heights* applied in excluding the diesel fuel claims from the CWA's zone of interests. 520 U.S. at 175–76, 117 S.Ct. 1154. In *Bennett,* the Supreme Court simply reaffirmed a well-established doctrine-that a plaintiff's suit need not "vindicate the overall purpose" of a statutory regime so long as her interest is protected by "the specific provision which they alleged had been violated." *Id.* at 176, 117 S.Ct. 1154. Whether or not it cites *Friendship Heights,* WASA cannot prevail on its argument that the CWA provides standing only for claims directly involving the pollution of navigable waters. *See* Def.'s Mot. for Summ. J. at 53 n. 32 (citing *Friendship Heights,* 765 F.2d at

1173, as support for the statement that "only discharges to navigable waters may be permitted under NPDES program.").[2] As a result, the court finds no reason to disturb its previous order.

█ Aside from treading old ground, WASA identifies new materials-released after this court's previous order-to justify its standing arguments. WASA cites EPA regulations, Def.'s Mot. for Summ. J. at 34, which indicate that the CWA does not regulate odor. Def.'s App. at 1407 (Notice of Proposed NPDES General Permit for Egg Production Operations, 66 Fed.Reg. 50,646 (Oct. 4, 2001)) (finding that "[odor is] not subject to regulation under the Clean Water Act"); *id.* at 1409 (Proposed Rule, Effluent Guidelines Limitations and New Source Performance Standards for Meat and Poultry Products Point Source Categories, 67 Fed.Reg. 8582 (Feb. 25, 2002)) (same). However, these regulations are entirely compatible with the court's previous order. A plaintiff has standing to bring a citizen suit so long as she alleges violation of a CWA or NPDES permit provision. *See, e.g., Friends of the Earth,* 204 F.3d at 152. As a corollary, a plaintiff does not lose standing simply because

odor, not polluted water, is the injury she suffers as a result of a CWA violation.

WASA also cites new case law which, WASA claims, limits the CWA's jurisdictional reach. *See* Def.'s Mot. for Summ. J. at 35–38 (citing *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001)). WASA argues that *Solid Waste* indicates that CWA jurisdiction "extends only to discharges interacting with navigable waters." Def.'s Mot. for Summ. J. at 35. However, *Solid Waste* did not purport to reinterpret the general scope of the CWA. Rather, the Court found that a rule promulgated by the Army Corps specifically exceeded the scope of 33 U.S.C. § 1344(a).[3] The Court rejected the Army Corps' regulation after an exegesis of the text and legislative background of § 1344(a) in particular. *Solid Waste* did not reject the Army Corps' rule because it failed to serve the CWA's general purpose. *See id.* at 167– 72, 121 S.Ct. 675. *Solid Waste* simply does not support WASA's standing argument because it did not purport to limit the zone-of-interests protected by CWA provisions other than § 1344(a).[4] To apply

---

**2.** In addition, WASA is wrong to argue that *Friendship Heights* precludes citizen suits under the CWA merely because they might be better brought as common law claims, such as nuisance or trespass. *See* Def.'s Mot. for Summ. J. at 53. Rather, *Friendship Heights* found that the seepage plaintiff complained of could not, as a factual matter, be brought under the CWA's citizen suit, not *because* the seepage was actionable at common law as a trespass. *See* 765 F.2d at 1173 n. 3 (finding that the "Act does not require a permit for all leaks" and that, as a result, plaintiff's claim was not actionable under the CWA because the diesel fuel leaked into plaintiff's basement before entering a waterway).

**3.** The Supreme Court analyzed the scope of rules promulgated under 33 U.S.C. § 1344(a) (regulating "the discharge of dredged or fill materials into navigable waters") and 33

U.S.C. § 1362(7) (defining "navigable waters" as "the waters of the United States"). The Court held that the Army Corps' "Migratory Bird Rule," which allowed it to regulate discharges into non-navigable, intrastate waters, clearly exceeded the limits of § 1344(a). *See* 531 U.S. at 172, 121 S.Ct. 675 (finding that Army Corps rule clearly disregarded § 1344(a) and that, in any case, the rule did not deserve deference under *Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**4.** Indeed, it is difficult to see how *Solid Waste* can be applied to limit the general scope of the CWA when courts have, apparently, had difficulty applying the case to what it purportedly limited-rules promulgated under § 1344(a). *See, e.g., FD & P Enterprises, Inc., v. U.S. Army Corps of Eng'rs,* 239 F.Supp.2d

*Solid Waste,* as WASA understands it, to the present case would be to contradict *Bennett,* 520 U.S. at 175–76, 117 S.Ct. 1154 (requiring zone of interests arguments to be made by "by reference to the particular provision of law upon which the plaintiff relies"), which *Solid Waste* did not purport to supercede or overrule. *See generally* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576. *Solid Waste* did not even mention *Bennett. Id.*

Clearly, plaintiffs brought suit to stop the emission of odors. This fact alone does not bar plaintiffs' claim so long as they allege violation of a specific CWA or NPDES permit provision. Neither the CWA nor case law requires a direct connection between the violation of an NPDES permit provision and a plaintiff's injury. Indeed,

> Courts are not at liberty to write their own rules of evidence for environmental standing by crediting only direct evidence of impairment. Such elevated evidentiary hurdles are in no way mandated by Article III. Nor are they permitted by the Federal Rules of Evidence or the text of the Clean Water Act. It is in fact difficult to see how one can move from the [§ 1365(g), the citizen suit provision] standard of "an interest which is or may be adversely affected" to a standard of direct scientific proof of an observable negative impact on a waterway.

*Friends of the Earth,* 204 F.3d at 149 (Wilkinson, C.J., writing for en banc court). So long as plaintiffs allege a violation of a specific provision of the CWA, they have standing to sue.

## C. Statute of Limitations

WASA asserts, as it did in its motion to dismiss, that plaintiffs' claim is barred by the general five-year statute of limitations in 28 U.S.C. § 2462. Specifically, WASA claims that the limitations period begins to run at the moment of violation. *See* Def.'s Mot. for Summ. J. at 58 (citing *3M v. Browner,* 17 F.3d 1453, 1461 (D.C.Cir. 1994)). WASA provides that any "moment of violation," if one existed, occurred prior to 1987 when all carbon filters were removed. *See* Def.'s Mot. for Summ J. at 59 (citing Def.App. at 8, 312, 947).

These arguments both ignore the law of the case and misunderstand *3M.*

WASA raises essentially the same statute of limitations argument in its summary judgment motion as in its motion to dismiss. *Compare* Def.'s Mot. for Summ. J. at 58–60 *with* Def.'s Mot. to Dismiss at 23–24. The court found this argument meritless when it denied WASA's motion to dismiss: "[I]t is patently clear that plaintiffs allege an ongoing continuous violation of WASA's permit." Nov.2000 Order at 3 n. 1 (citing *L.E.A.D. Group v. Exide Corp.,* 1999 WL 124473, at *3–4, *19–20 (E.D.Pa. Feb. 19, 1999) and *United States v. Reaves,* 923 F.Supp. 1530, 1533 (M.D.Fla. 1996) as authority that five-year statute of limitations period does not run when defendant's CWA violation is ongoing). WASA cites a number of "new" factual materials in its motion for summary judgment. *See* Def.'s Mot. for Summ. J. at 59 (citing Def.'s App. at 8, 312, 947, 1283). These sources support assertions WASA made in its motion to dismiss-that it had "abandoned proper maintenance of the alleged carbon filters several decades ago," that the statute of limitations began to run more than five years ago, and that the present action is therefore barred. Def.'s Mot. to Dismiss at 24.

509, 513 (D.N.J.2003) ("In the wake of *Solid Waste,* courts have struggled with evaluating the jurisdictional reach of [§ 1344(a) ].").

However, these essentially undisputed facts are immaterial to the law established by the court's previous order, which recognized that plaintiffs alleged ongoing violations of an NPDES permit. Nov.2000 Order at 3 n. 1. Furthermore, as plaintiffs argue, Pls.' Cross–Mot. for Summ. J. at 33–34, *3M* does not bar entirely an action brought to stop ongoing violations which began more than five years before the complaint was filed. Rather, *3M* holds that § 2462 does not permit the collection of civil penalties for violations that took place more than five years before the action commenced. 17 F.3d at 1454–55. In *3M*, the EPA filed suit in 1988 alleging repeated violations of the Toxic Substances Control Act, 15 U.S.C. §§ 2601–2629, from 1980 to 1986. *Id.* The D.C. Circuit precluded EPA from recovering civil penalties for violations between 1980 and 1983, five years before EPA instituted its lawsuit. *See id.* at 1463 ("EPA may not assess civil penalties against 3M for any violations ... allegedly committed by the company more than five years before EPA commenced its proceeding"). Otherwise, *3M* did not bar as untimely suits, by citizens or EPA, to stop alleged ongoing violations of an environmental statute. *Id.*

The *3M* case does bar plaintiffs from recovering civil penalties for CWA violations WASA committed before 1994, five years before the commencement of the present action. But *3M* does not bar the present suit as untimely. The court therefore denies WASA summary judgment on its statute of limitations argument.

### D. Interpretation of NPDES Permit Provision

Plaintiffs satisfied the zone of interests standing requirement by bringing suit under a particular CWA provision and alleging that WASA violated a specific NPDES permit provision. Plaintiffs were not required to show that the permit provision which they sought to enforce directly advanced the Act's general purpose of limiting effluents introduced into the nation's waterways. There is, however, a difference between alleging an injury sufficient to maintain standing, as a matter of jurisdiction, and providing enough evidence to prevail on summary judgment. *See Piney Run Preservation Ass'n v. County Comm'rs of Carroll County, Maryland,* 268 F.3d 255, 263–64, 270–71 (4th Cir.2001) (finding that while plaintiff association properly demonstrated standing, by tracing injury to defendant's actions, it failed to demonstrate that defendant's NPDES permit prohibited the alleged activity); *Wilderness Soc'y,* 824 F.2d at 16 (requiring greater showing by plaintiff on summary judgment).

In order to prevail on summary judgment, plaintiffs must demonstrate that there is no genuine issue of fact regarding their claim. FED. R. CIV. P. 56. In this case, they must demonstrate that WASA had an obligation, under the M & O Clause of the 1997 Permit, to operate and maintain carbon filters. *See* Compl. ¶¶ 18, 22. Plaintiffs must also show that WASA failed to comply with this obligation. *Id.* ¶ 22. The court must deny plaintiff's summary judgment motion and must grant WASA's summary judgment motion. There is no genuine issue of material fact with regard to the claim that the 1997 Permit itself created an obligation to operate or maintain carbon filters; plaintiffs provide no materials to support this assertion, and all other evidence tend to contradict the assertion.

The interpretation of a NPDES permit provision is a question of law for the courts to decide. *Natural Resources Def. Council, Inc., v. Texaco Refining & Mktg., Inc.,* 20 F.Supp.2d 700, 710 (D.Del.1998). Indeed, another circuit found it "manifestly erroneous" to allow a

jury to decide the meaning of an NPDES permit. *United States v. Weitzenhoff,* 35 F.3d 1275, 1286–87 (9th Cir.1993). Furthermore, courts must analyze a provision of a NPDES permit in the same manner it would review a contract or another legal document. *Piney Run,* 268 F.3d at 269; *Northwest Envtl. Advocates,* 56 F.3d at 983. That is, if a NPDES permit provision is unambiguous, that language controls. *See Piney Run,* 268 F.3d at 269; *Northwest Envtl. Advocates,* 56 F.3d at 982–83. But if the permit provision is ambiguous, the court may examine extrinsic evidence to uncover the provision's meaning. *See Piney Run,* 268 F.3d at 270; *Northwest Envtl. Advocates,* 56, F.3d at 982; *Texaco,* 20 F.Supp.2d at 709.

### 1. Express Text

The specific issue, at this point in the analysis, is whether the M & O Clause is ambiguous. If its meaning is clear upon an examination of its explicit terms, the provision is unambiguous. *See Potomac Elec. Power Co. v. Mirant Corp.,* 251 F.Supp.2d 144, 148 (D.D.C.2003). However, if its provisions are "reasonably or fairly susceptible of different constructions or interpretations," it is ambiguous. *Id.* The parties' cross-motions for summary judgment imply two different questions of ambiguity-first, in support of plaintiffs, does the M & O Clause unambiguously require WASA to maintain carbon filters? And, second, in support of WASA's argument, does the clause unambiguously excuse WASA from the same? Because the answer to both questions is no, the court finds the M & O Clause ambiguous.

The M & O Clause is a boilerplate provision lifted entirely from 40 C.F.R. § 122.41(e). *Compare* 1997 Permit at 19 *with* 40 C.F.R. § 122.41(e). It does not once mention carbon filters, hydrogen sulfide or anything of the sort. The M & O Clause cannot be read to expressly or unambiguously *require* the maintenance of filters on vents or odor control when it does not even mention them. *See* 1997 Permit at 19. Plaintiffs essentially concede this. Pls.' Cross–Mot. for Summ. J. at 35 ("Plaintiffs do not, and have never, claimed that the Permit contains *express* limits on hydrogen sulfide or odor.") (emphasis added). On the other hand, the M & O Clause does not expressly or unambiguously excuse WASA from maintaining carbon filters. The clause requires proper maintenance, operation and inspection of those "systems of treatment and control . . . which are installed or used by the permittee to achieve compliance with conditions of this permit." *Id.* Clearly, the permit requires WASA to properly maintain equipment used to comply with express permit provisions, e.g., effluent limitations. However, what remains unclear is whether "conditions of this permit" requires proper maintenance of equipment used to comply with *implied* permit provisions. The word "conditions" is not synonymous with "express terms" or "written terms"; its meaning is rather broader, something more akin to a general obligation, express or implied. *See, e.g.,* Webster's Ninth New Collegiate Dictionary (9th ed.1985) (explaining "condition," in the first definition listed, to be "a premise upon which the fulfillment of an agreement depends"). Because the word "conditions" is susceptible to two reasonable readings-encompassing both express and implied obligations-the M & O Clause cannot be read to exclude the possibility that WASA was obligated to maintain equipment used to comply with implied permit provisions. Therefore, the court finds the M & O Clause ambiguous. As a result, the court may refer to extrinsic evidence in order to interpret the M & O Clause. *See Piney Run,* 268 F.3d at 270; *Northwest Envtl. Advocates,* 56 F.3d at 982.

It is troubling, though not dispositive, that plaintiffs concede that the M & O

Clause does not explicitly require WASA to install carbon filters or control odor. In successful citizen suits brought to enforce non-effluent limitations, the prevailing plaintiffs seemed always able to identify violations of *explicit* permit provisions. *See Friends of the Earth,* 204 F.3d at 153, 157 (allowing suit to enforce express effluent limitations on discharge of cadmium, copper, iron, lead and zinc); *Northwest Envtl. Advocates,* 56 F.3d at 979, 986 (upholding enforcement of a NPDES permit that was "clear on its face in permitting [combined sewer overflow] events under specified conditions"); *Conn. Fund,* 631 F.Supp. at 1283, 1285 (allowing enforcement of NPDES permit provision expressly limiting discharges into a lagoon, though the lagoon was not otherwise subject to CWA regulation because discharges into the lagoon might never reach navigable waters); *Locust Lane,* 636 F.Supp. at 537–38 (enforcing NPDES permit provision setting a schedule for the construction of wastewater treatment facilities); *Pymatuning,* 506 F.Supp. at 904 n. 1, 905 n. 2, 908 (upholding enforcement of specific construction requirements contained in a NPDES permit, including *inter alia* "tight, well-fitting joints" and concrete "cured from injury by water, freezing, drying or other harmful conditions"). At least one court indicated its reluctance to enforce specific, though implied, conditions through the general, but explicit, terms of a NPDES permit. *See Piney Run,* 268 F.3d at 271 (finding that neither the express terms, nor extrinsic evidence interpreting such terms, of a NPDES permit supported a reading that prohibited heat

discharges). Persuasive authority, therefore, seems to require courts to examine extrinsic evidence in interpreting NPDES terms [5] while discouraging them from being eager to enforce implied obligations in permits.

## 2. Extrinsic Evidence

When the express terms of a legal document are ambiguous, extrinsic evidence may be used to interpret it. Specifically, extrinsic evidence is used to "determine the circumstances surrounding the making of the contract so as to ascertain what a reasonable person in the position of the parties would have thought the words meant." *Potomac Elec.,* 251 F.Supp.2d at 150. Therefore, both objective and subjective (the intentions of the parties) evidence can be relevant. *Id.* at 148 (applying the "objective law of contracts whereby the written language embodying the terms of an agreement will govern . . ., irrespective of the intent of the parties at the time they entered the contract, *unless* the written language is not susceptible of a clear and definite understanding . . . .") (emphasis added); *id* at 149 ("[T]he court should look to the intent of the parties entering into the agreement."). Relevant forms of extrinsic evidence include circumstances before, during, and surrounding the making of the contract, customary practices the parties had reason to know about, and the course of conduct of the parties. *Id.* at 150.

Plaintiffs' claim depends almost completely on extrinsic evidence, since the 1997 Permit says nothing specific-that is,

---

5. In any other contract case, on cross-motions for summary judgment, if the terms of the contract are ambiguous, the court can simply deny both motions and allow a jury to decide the facts, extrinsic evidence, at trial. *See, e.g., Potomac Elec.,* 251 F.Supp.2d at 150 (denying motions for summary judgment when contract terms were "reasonably sus-

ceptible to different interpretations and is therefore ambiguous"). However, at least one court found it "manifestly erroneous" for a court to delegate to a jury the task of analyzing extrinsic evidence in order to interpret an NPDES permit. *See Weitzenhoff,* 35 F.3d at 1286–87.

nothing at all-about WASA's obligation to operate and maintain carbon filters. *See generally* 1997 Permit; Pls.' Cross–Mot. for Summ. J. at 35 (acknowledging that 1997 Permit contained no express limits on hydrogen sulfide or odor control requirements). The evidence upon which plaintiffs relies does show WASA's obligation, but only vis-a-vis the Park Service, to operate and maintain carbon filters; they fail to show that such obligations were enforceable, or were connected in any way to, the 1997 Permit. Other pieces of extrinsic evidence support the conclusion that none of the parties (EPA, Park Service, WASA) involved in executing relevant legal documents (1997 Permit, Park Service permits) intended the filter obligations in the Park Service permits to be enforced through 1997 Permit or CWA. The court analyzes, first, evidence that the Park Service obligated WASA to maintain carbon filters, and, second, the evidence that those obligations were enforceable through the 1997 Permit.

First, plaintiffs arguments hint that certain Park Service (not NPDES) permits requiring carbon filters are critical to proving their claim, for they create WASA's legal obligation in the first place. Plaintiffs claim that WASA's predecessor "needed NPS permission to construct, operate and maintain [the District of Columbia-based] portions of the system." Pls.' Cross–Mot. for Summ J. at 2. Further, plaintiffs maintain that "as a necessary precondition to the construction and operation of portions of the Potomac Interceptor, the Park Service required WASA to install and maintain carbon filters on all vents ... located on U.S. Government Property." Pls.' Reply at 1. As a result, plaintiffs conclude that "an odor-control system on the PI vents was a necessary condition for the construction of PI [and] remains a necessary condition for its operation," and that WASA's predecessor acquiesced to these requirements. Pls.'

Cross–Mot. for Summ. J. at 35. In other words, this is the "implied condition" which plaintiffs claim to be enforceable through the M & O Clause. The 1997 Permit requires WASA to properly maintain all equipment used to comply with "conditions of the permit," 1997 Permit at 19, and plaintiffs allege that one "necessary precondition" to the permit is odor control via carbon filter.

Indeed, the Park Service permits do show that WASA had duty to install filters. In 1962, the Park Service clearly required some form of odor management-either ventilation of odors off of Park lands or filtering of hydrogen sulfide-when it first allowed WASA's predecessor to construct the PI and UPI on federal lands. *See* Def.'s App. at 911, 913 (Horne Ltr. to Bd. of Commissioners, Gov't of Dist. of Columbia at 1, 3 (Apr. 12, 1962)) (requiring WASA predecessor to abide by all terms in the permit "as long as this facility is in place" and requiring, inter alia, that "[a]ll vent structures shall either be located off United States property or shall provide for odor controlled carbon filters."); *id.* at 906 (Freeman Ltr. to Head, Jun. 6, 1962) (requesting WASA predecessor to "take the necessary action to revise the vent structures, located on park land, to accommodate carbon filters"). Further, in 1999, the Park Service reminded WASA of its duty to maintain carbon filters just before plaintiffs initiated the present action:

> The permit issued to your agency on April 12, 1962, states in paragraph 16, "All vent structures shall either be located off Untied States property or shall provide for odor controlled carbon filters." The strong odor that is present seems to indicate that the carbon filters have failed and maintenance is required. Please arrange to correct this problem as soon as possible.

Def.'s App. at 651 (Faris Ltr. to Marcotte, Aug. 24, 1999). In response, WASA's General Manager Michael Marcotte neither confirmed nor denied having an obligation to maintain the filters, but rather reported that WASA would "review their condition and odors associated with the operation of the sewer" and would "advise you of our specific action plans as they are developed." Def.'s App. at 652 (Marcotte Ltr. to Faris, Sept. 10, 1999). In between 1962 and 1999, the Park Service reminded, at least once, WASA of the issue of carbon filters. NPS complained of a "continual discharge of sewer gas" and noted that the under the 1962 and 1966 permit actions, charcoal filters "were and still are required." Def.'s App. at 226–27 (Stanton Ltr. to White, Jun. 13, 1984); *see also id.* (noting that "the Chesapeake and Ohio Canal National Historical Park has been particularly affected by non-maintenance of the filters.").

WASA does not seriously contest this evidence. WASA, for instance, attempts to argue that the original 1961 and 1962 Park Service permits merely "requested that the District install carbon filters." Def.'s Mot. for Summ. J. at 7. WASA also claims that the 1984 Park Service letter was less than clear in requiring maintenance of carbon filters, and if maintenance was mandatory, the obligation extended only to relatively few stretches of the PI. *See* Def.'s Reply at 16–18. However, the Park Service documents use obligatory not hortatory language—each requires WASA to install filters. See Def.'s App. at 226–27 (1984 letter); 651 (1999 letter), 911, 913 (1962 Permit). They expressly indicate that WASA had, and still has, an obligation *vis-a-vis the Park Service* to control odor, probably by installing carbon filters. Finally, a WASA official has essentially conceded the binding nature of Park Service permits. Pls.'s Ex. 3 (Doane Dep. at 39) ("any modifications [WASA proposes] also require permits from the National Park

Service.") *cited at* Pls.' Cross–Mot. for Summ. J. at 13.

Whether the Park Service obligated WASA to install carbon filters requires no further scrutiny. An examination of the Park Service permits does, however, highlight the comparative dearth of evidence to support the next logical step in plaintiffs' argument. Because plaintiffs bring suit under the CWA to enforce an NPDES permit provision, they must demonstrate not only that WASA has an obligation to operate and maintain filters, but also that that obligation is enforceable through the 1997 Permit. Plaintiffs fail to present any evidence on this second, critical point. No evidence even suggests that these obligations were enforceable through the 1997 Permit, or that the Park Service or EPA had any such intention. Without this critical link, the court must deny plaintiffs' summary judgment motion and grant WASA's motion.

Neither party identifies materials that indicate that the EPA, Park Service or WASA intended or believed that the Park Service permit requirements were enforceable through the 1997 Permit specifically. Nothing in the record suggests that the 1997 Permit incorporated by reference the Park Service requirements. *See generally* 1997 Permit. Certainly, as plaintiffs concede, nothing in the M & O clause refers to maintenance of equipment to fulfill Park Service obligations. *See id.* at 19. Indeed, the 1997 Permit mentions the National Park Service only once. The permit requires WASA to submit a quarterly report to the Park Service, amongst other "users of the sanitary system and local government officials and the general public," in order to inform them of "the extent of actual compliance with permit requirements and conditions; additionally the permittee shall include in this report information the efficacy of all (on and off site)

operations utilized in the disposal of sludge from the Blue Plains WWTP." *See* 1997 Permit at 31. Under the 1997 Permit, WASA's only obligation vis-a-vis the Park Service is to provide compliance reports. In addition, no Park Service documents on the record suggest that the Park Service intended or believed its permits to be enforceable through the 1997 Permit. Indeed, the Park Service documents fail to mention the EPA, Clean Water Act, or 1997 Permit even once. *See generally* Def.'s App. at 651, 906, 911, 913 (Park Service documents sent to WASA after passage of the Clean Water Act). Finally, plaintiffs agree that they are not enforcing the Park Service permit itself. *See* Def.'s App. at 929–31. As a result, the court concludes there is no evidence, objective or subjective (i.e., regarding the intentions of the EPA or the Park Service) that the filter maintenance requirement was specifically enforceable through the 1997 Permit.

As a more general matter, it seems that the EPA did not intend to allow enforcement of conditions external to a NPDES permit through the permit itself. Neither did EPA apparently intend to require odor control.

General EPA guidance documents indicate that the boilerplate M & O Clause, included in all NPDES permits, does not generally enforce conditions external to a NPDES permit. The most direct evidence of this is EPA's manual on NPDES permits. *See* Def.'s App. at 1017–25 (U.S. EPA NPDES Permit Writers' Manual (1996)) ("NPDES Manual"). The manual advises permitting authorities, explaining the meaning of and reasons for different permit provisions. *Id.* at 1021–22 (NPDES Manual at 176–68). In a section on boilerplate clauses, the EPA explains the M & O Clause, lifted verbatim from 40 C.F.R. § 122.41(e), this way:

Proper Operation and Maintenance ... The permittee must properly operate and maintain all equipment and treatment systems used by the permittee for compliance *with the terms of the permit.* The permittee must provide appropriate laboratory controls and quality assurance procedures. Backup systems are required when needed to ensure compliance. However, each main line unit treatment process must be operated at a minimum.

Def.'s App. at 1022 (NPDES Manual at 168) (emphasis added). This guidance document, somewhat more explicitly than the M & O Clause itself, only requires permittees to maintain equipment in order to comply with other *express* permit provisions. *Compare* 1997 Permit at 19 (requiring maintenance of systems used for "compliance with conditions of the permit."). Put another way, the manual interprets the boilerplate M & O clause *not* to require maintenance of equipment used to comply with implied permit conditions. The EPA NPDES manual can hardly be said to provide extensive guidance, but it is the only evidence presented by the parties that helps interpret the M & O Clause, and it supports WASA's reading of the maintenance provision.

In addition, other guidance documents indicate that the EPA generally abstains from regulating odor. One indicates that the best, and only extant, means of regulating odor is the state common law of nuisance:

[E]fforts to establish quantified acceptability or annoyance threshold levels for any particular odorant [sic] are fraught with subjective evaluations. Subjective reactions to odor differ between individuals and between communities. Indeed, this factor is a major reason for the view that nuisance law is an appropriate mechanism for addressing odor problems. Despite all of its substantive, procedural, and evidentiary shortcomings,

the nuisance approach is the only odor-regulation strategy now in use that is tied directly to the basic criterion of an unreasonable interference with public or private rights.

Def.'s App. 696 (Regulatory Options for the Control of Odors, EPA Doc. 450 5–80–003, at 14 (1980)). That is, EPA does not purport to regulate odor through either the CWA or Clean Air Act. *See id.* A different EPA guidance manual document-both thorough and thoroughly technical-on hydrogen sulfide odor and corrosion in sewer systems provides no indication that the CWA, or EPA generally, requires odor control technology. *See generally* Def.'s App. 1080–1224 (Design Manual: Odor and Corrosion Control in Sanitary Sewerage Systems and Treatment Plants, EPA Doc. EPA/625/1–85/018 (1985)). Rather, the EPA seems to acknowledge the need for wastewater authorities to balance competing factors-on the one hand, "[w]astewater is known to the public for its potential to create odor *nuisance* " but, on the other, hydrogen sulfide can "corrode various materials used in sewer and treatment plant construction." *Id.* at 1090 (Design Manual at 1) (emphasis added). The manual also assumes that state law, not federal law or the EPA, operates to require odor control.

*See id.* Put together, these guidance documents indicate that the EPA did not intend, in drafting the 1997 Permit and M & O Clause, to obligate WASA to install and maintain filters or control odor.

After exhausting the possibilities, the court finds, as a matter of law, there is no connection between the M & O Clause, or any other 1997 Permit provision, and the Park Service requirement that WASA maintain carbon filters. As plaintiffs present it, the Park Service requirement is, legally, an obligation in the air, detached from the very NPDES permit which plaintiffs claim to enforce. The court concludes that WASA had no obligation *under its NPDES permit* to operate or maintain carbon filters.[6] The court need not reach WASA's other arguments in support of summary judgment.

**CONCLUSION**

Plaintiffs fail to demonstrate a connection between any obligations imposed by the Park Service and the NPDES permit provision through which they sought vindicate their claim. Plaintiffs sued under the CWA and must, therefore, identify a legal obligation specifically under the CWA which WASA failed to uphold. The boiler-

---

**6.** Plaintiffs hint at, if they do not directly argue, an analytically distinct basis for WASA's obligation to operate and maintain carbon filters in PI and UPI-that WASA's predecessors "incorporated carbon filters into the design" of certain segments of the PI and UPI in response to the Park Service's requirement that WASA manage hydrogen sulfide odors. *See* Pls.' Cross–Mot. for Summ. J. at 13 (citing Pls.' Ex. 1 (Head Ltr. to Black & Veatch, June 7, 1962)). Elsewhere in their briefs, plaintiffs indicate that the carbon filters are "integral" parts of the PI and UPI. *See* Pls.' Cross–Mot. for Summ. J. at 16 (citing Def.'s App. at 946 (Bell Expert Report at 9)).

Plaintiffs are wrong if they mean to suggest that the carbon filters must be maintained and operated, under the M & O Clause, simply because they are "integral" parts of the

design of the PI and UPI. Nothing suggests that the absence of filters on vents would collapse the PI or UPI, or otherwise cause WASA to violate the effluent limitations in its permit. Clearly, it is not in the strict structural or engineering sense that plaintiffs mean "integral."

Rather, whether or not equipment is "integral" is a legal matter not dictated by project design but rather obligations imposed by permit. The carbon filters are "integral" only to the extent that the Park Service requires them. The court has already established that obligations imposed by Park Service permits can not be enforced through the 1997 Permit. There is no reason, independent of the Park Service permits, that the carbon filters are necessary to the operation of the PI and UPI.

plate maintenance provision requires reference to another, explicit NPDES permit provision. By failing to connect the dots, as it were, plaintiffs cannot maintain an action under the CWA.

Plaintiffs' argument is troubling because the principle underlying it would expand the CWA beyond recognition, such that it would be hard to distinguish actions properly brought under the Act and actions conveniently brought through it. Plaintiffs argue that it is absurd to think that their argument would, as WASA suggests, validate actions to quell the noise from a wastewater facility, or actions to remove or paint over unsightly pipes in the view of area residents. *See* Pls.' Cross–Mot. for Summ. J. at 36 (citing Def.'s Mot. for Summ J. at 24) (arguing that). But, if the court correctly understands plaintiffs' argument, these actions would be enforceable under the CWA had the Park Service required noise control or aesthetically pleasing pipes as conditions for the construction of the PI and UPI. In this case, plaintiffs' attempt to enforce obligations not contained in the CWA or WASA's NPDES permit and *conceded* to be unrelated to the general purposes of the CWA.

The CWA is already generous to the extent that it allows the EPA and affected citizens to bring suit for violations of any NPDES permit violations even though the permit provisions themselves may not be strictly related to limiting water pollution. *Bennett,* amongst other cases, allows this. *See* 520 U.S. at 175–76, 117 S.Ct. 1154. Perhaps it would not be possible to advance the primary objectives of a statutory regime (e.g., controlling water pollution) without enforcement of mundane administrative or maintenance requirements, such as contained in the M & O Clause. But to allow the enforcement of legal obligations

not actually contained in a permit would be to open the floodgates, as it were. At some point, the CWA, like any federal statutory regime, must have boundaries. Whether or not a principled line, separating proper CWA actions from non-CWA actions, can be cleanly drawn, in this case, plaintiffs' claim falls on the wrong side of the line. The CWA citizen suit provision, by way of WASA's 1997 Permit, is the wrong mechanism to enforce WASA's obligation to maintain carbon filters.